## LOUISE M. GRIFFITH, Appellant, v. CONTINENTAL CASUALTY COMPANY.

In Banc, July 2, 1923.

1. **ACCIDENT INSURANCE: Physician as Witness: Tuberculosis: Waiver.** Where plaintiff's evidence in chief in her suit on an accident insurance policy issued to her husband has established the fact that he had had tuberculosis for a considerable time prior to his death, she is not prejudiced by the further testimony of his physician, offered by defendant, that such was the fact, although the physician was incompetent to testify to that fact.

2. ———: ———: **Statements of Deceased.** In a suit on an accident policy the physician of the insured is not incompetent to testify that the insured, while he was treating him for tuberculosis, had said that he did not think life worth living and that he had as well jump in the river. That information was not necessary to enable the physician to prescribed for the insured as a patient. Furthermore, even if the physician were incompetent to testify to the despondent statement, it was harmless, where he further tes-

Griffith v. Continental Casualty Co.

tified that after treatment the progress of the disease was stayed and the insured lived for nearly five years thereafter and died from an entirely different cause.

3. ———: **Incompetent Evidence: Non-Prejudicial.** Where it is apparent that evidence admitted was in no way prejudicial to appellant, it is unnecessary to determine whether or not it was incompetent.

4. ———: **Conclusion of Witness: Conjecture.** If a witness has had means of personal observation, and the facts and circumstances upon which he bases his conclusion are incapable of being detailed intelligently so as to enable any one except himself to form an intelligent conclusion from them, he may state his conclusion as the ultimate fact; but where it is evident that he did not have sufficient means of observation to form an intelligent conclusion, his opinion is nothing more than conjecture, and if gratuitously given should be stricken out. ·

5. ———: **Proofs of Death: To Establish Vexatious Delay: Cured by Instruction.** Proofs of the insured's death are not competent to establish vexatious refusal to pay an accident policy; but error in admitting them for that purpose is cured by an instruction withdrawing them from the consideration of the jury.

6. ———: **Death Certificate.** A copy of a death certificate, certified by the State Registrar of Vital Statistics, is by statute (Sec. 5816, R. S. 1919) competent evidence of the facts stated therein.

7. ———: **Accidental Death: Burden of Proof.** In an action founded on an accident policy the burden of proof to establish the issue that insured's death was effected through accidental means rests upon the plaintiff, and that burden never shifts.

8. ———: ———: **Shifting Burden: Presumption Against Suicide.** The presumption against suicide is a rebuttable legal presumption, and does not shift from plaintiff to defendant the burden of establishing that the fall from a window, which resulted in the insured's death, was accidental. The presumption is not evidence; it is a mere rule of law which operates to throw upon defendant the duty of going forward with the evidence, and performs no other function and has no other significance.

9. ———: ———: ———: ———: **Instruction.** In an action on an accident insurance policy, an instruction for defendant telling the jury that "a finding that the death of the insured was due to an accidental fall, instead of an intentional fall, cannot rest upon conjecture or guess upon the part of the jury, but must be found from the evidence in the case, and the burden of proving that the fall was accidental rests upon plaintiff; if the plaintiff has

Griffith v. Continental Casualty Co.

not proven that it was accidental, or if, under the evidence, the jury· cannot ascertain whether it was accidental or intentional, then they cannot find for the plaintiff on the theory that the death was due to accident"; and another instruction declaring that "in dealing with the question whether the death of insured was due to an accidental fall from the window, or to an intentional fall, the jury are instructed that the burden of proof· is on the plaintiff to prove, by the preponderance or greater weight of the testimony, that this fall was accidental," were not erroneous. The instructions did not deprive plaintiff of the presumption against suicide, although it might have been proper, if the court had been so requested, to have given an instruction to the effect that, in weighing the facts and circumstances, the jury might consider the instinct of self-preservation inherent in all normal beings. But the presumption against suicide was not evidence, but a rule of law to guide the court, and had served its purpose and gone out of the case when the case was submitted to the jury, and had at no time operated to shift the burden from plaintiff to establish, by the greater weight of the evidence, that the insured's death was accidental.

Appeal from St. Louis City Circuit Court.—*Hon. H. A. Hamilton*, Judge.

AFFIRMED.

*Kinealy & Kinealy* for appellant.

(1)　A physician is incompetent to testify as to information derived from his patient, and all information as to the patient is presumed to be privileged. R. S. 1919, sec. 5418; State v. Kennedy, 177 Mo. 98; Green v. Railroad Assn., 211 Mo. 18; Owens v. Railway, 225 S. W. 234; 40 Cyc. 2396, Witnesses; 10 Ency. Ev. 158, Priv. Com.; 4 Jones Comm. on Ev. 559, sec. 760; Battis v. Railway, 124 Iowa, 623; Renihan v. Denim, 103 N. W. 574; Munz v. Railroad, 25 Utah, 220; Penn Co. v. Marion, 123 Ind. 413; Freel v. Railway, 97 Cal. 40. (2) Threats made close enough to death to throw light upon it are admissible, but not when remote. State v. Elkins, 63 Mo. 159; 1 C. J. 499, Accident Insurance; 25 Cyc. 940, Life Insurance; Mut. L. & I. Co. v. Hillman, 145

U. S. 285; State v. Kelley, 77 Conn. 266; Hale v. Life I. & I. Co., 65 Minn. 548; Rens v. Northwest M. L. R. Assn., 100 Wis. 266.   (3)   City hospital records cannot be made competent evidence by city ordinances.   Smart v. Kansas City, 208 Mo. 162; Bagley v. St. Louis, 149 Mo. 122; Cohen v. Term. Ry. Co., 193 Mo. App. 69.   (4) Provisions in the policy for furnishing proofs of death are conditions precedent.   Ins. Co. v. Kyle, 11 Mo. 289; McCullough v. Ins. Co., 113 Mo. 606; McFarland v. Acc. Assn., 124 Mo. 204.   (5)   The proofs of loss are evidence that the requirement of the policy has been complied with, but not of the facts therein stated.   Newmark v. Ins. Co., 30 Mo. 160; Bowman v. Anderson, 268 Mo. 1. (6)   An admission is a statement of a fact against the interest of the party marking it.   Sparr v. Willman, 11 Mo. 235.   (7)   The coroner's verdict is not evidence of the cause of death.   Kane v. Supreme Tent, 113 Mo. App. 119; State v. Garth, 164 Mo. 553; State v. Coleman, 186 Mo. 151; Prentiss v. Ins. Co., 225 S. W. 703; Union Co. v. Hollowell, 14 Ind. App. 611; Craiger v. Modern Woodmen, 40 Ind. App. 283; Aetna L. I. Co. v. Milward, 118 Ky. 716; Wasey v. Travelers Co., 126 Mich. 119; Boehme v. Sovereign Camp, 98 Tex. 380; Sullivan v. Electric Co., 51 Wash. 73.   (8)   Where the policy requires it, the beneficiary merely complies with the policy in furnishing the documents without vouching for their contents.   Ins. Co. v. Pulver, 126 Ill. 329; 14 R. C. L. 1445, Insurance.   (9)  The certificate from the State Board of Health was incompetent for the purpose of showing the cause of death.   R. S. 1919, sec. 5803; Schmidt v. Royal Arcanum, 207 S. W. 874; Simson v. Wells, 237 S. W. 520. (10)   Witness Harrison's statement that Griffith appeared unconscious was competent evidence. . 22 C. J. 530, Evidence; Eyerman v. Sheehan, 52 Mo. 221; Elsner v. Sup. Lodge, 98 Mo. 640; State v. Buchler, 103 Mo. 203; Rearden v. Railroad, 215 Mo. 105; State v. Niehaus, 217 Mo. 332; Partello v. Railroad, 217 Mo. 645; Kirchof

v. United Railways, 155 Mo. App. 70. (11) Where the circumstances give rise to the presumption of an accidental death the party against whom the presumption exists must overcome it by evidence. Reynolds v. Cas. Co., 274 Mo. 83; Brunswick v. Ins. Co., 278 Mo. 154; Andrus v. Bus. Men's Assn., 222 S. W. 70; Kahn v. Ins. Co., 240 S. W. 793; 4 Joyce on Ins., sec. 2640, p. 4419; 5 Joyce on Ins., sec. 3373, p. 6179; Insurance Co. v. Sheppard, 85 Ga. 751; Cosmopolitan Co. v. Koegel, 104 Va. 619; Standard Co. v. Thornton, 40 C. C. A. 564, 100 Fed. 582. (12) Where the evidence as to accident or suicide is evenly balanced the presumption of accident prevails. Brunswick v. Ins. Co., 278 Mo. 154; Griffith v. Cas. Co., 235 S. W. 83; Cases supra. (13) Presumptions disappear when the party in whose favor they operate produces evidence of the fact. Roden v. Transit Co., 207 Mo. 392; Tetweiler v. Railroad, 242 Mo. 178; Burge v. Railroad, 244 Mo. 76. (14) If no such evidence is produced by such party it is proper to instruct as to the effect of the presumption. Paramore v. Lindsey, 63 Mo. 63. (15) It is erroneous to give a number of instructions iterating and reiterating the same proposition. Heimbach v. Heimbach, 262 Mo. 69; Reeves v. Lutz, 191 Mo. App. 550. (16) Suicide is self-destruction through an intentional act done with the intent to cause death. Adkins v. Ins. Co., 70 Mo. 27; Haynis v. Knights Templar, 139 Mo. 416. (17) Instructions warning the jury against sympathy, etc., are only proper where the jury have shown some symptoms of undue regard for or against a party. Johnson v. Railway, 173 Mo. 307. (18) Direct evidence on the question of vexatious refusal to pay is not required. Kellar v. Ins. Co., 198 Mo. 440. (19) Abandoned pleadings are competent evidence on such issue. Fay v. Ins. Co., 268 Mo. 373.

*Jones, Hocker, Sullivan & Angert* for respondent.

(1) The plaintiff is estopped to assert error in the admission of evidence on behalf of the defendant in proof

of a fact which plaintiff has already established in her case in chief. Wiggington v. Rule, 275 Mo. 412, 450; Peterman v. Crowley, 226 S. W. 944, 946; Pinson v. Jones, 221 S. W. 80; Hart v. Brown, 216 S. W. 552; Akeman v. Wabash Ry. Co., 201 S. W. 590; Quarles v. Kansas City, 138 Mo. App. 45; Maveno v. New Guadalupe Mining Co., 170 Pac. 1088. Where the plaintiff in her case in chief has established a certain fact, the admission of testimony on behalf of the defendant in support of the same fact, even though incompetent, is harmless. Fuller v. Robinson, 230 Mo. 22; Heimbach v. Heimbach, 274 Mo. 301. (2) There is no privilege of that which the law requires a physician to disclose. (3) As the statutes, charter and ordinances of the city of St. Louis require a physician to report all cases of tuberculosis, a physician is competent to testify that a patient was afflicted with tuberculosis where a report to that effect has been made by such physician to the Health Department of the city. Secs. 5772, 5785, R. S. 1919; Art. XIII, Sec. 14, Charter of City of St. Louis; Secs. 1574, 1576, Ordinances of City of St. Louis, Wagner's Revised Code of St. Louis, p. 1230; Bogicevich v. Kenilworth Merc. Co., 199 Pac 406; McGinnity v. Bro. of Railway Trainmen, 166 Wis. 83. (4) A physician is only disqualified by statute from testifying to information obtained while attending a patient when such information is necessary to enable him to prescribe for such patient. Threats of suicide made by the patient are not necessary to enable a physician to prescribe for a patient, and the physician is competent to testify to the making of such threats. Halloway v. Kansas City, 184 Mo. 41; Jones v. Kansas City, 85 Mo. App. 20; Green v. Terminal Railroad Assn., 211 Mo. 36. The threats of suicide made by the insured to his physician were not incompetent because too remote from the time of the commission of the suicidal act. Browner v. Royal Indemnity Co., 246 Fed. 638. The question of the remoteness of threats of suicide appertains to the weight, and not to the competency, of such evidence. Blackburn

v. State, 25 Ohio St. 46. The report made by the insured's physician to the Health Department of the city of St. Louis that the insured was afflicted with tuberculosis was admissible in evidence because it was a public document or record. Simpson v. Wells, 237 S. W. 520; Priddy v. Boice, 201 Mo. 309; Reynolds v. Prudential Ins. Co., 88 Mo. App. 679; Ohmeyer v. Supreme Forest Woodmen of World, 81 Mo. App. 189. (5) The proofs of death, which included as a part thereof the verdict of the coroner's jury and the statement of the attending physicians, were not only admissible against the plaintiff on the issue of the alleged vexatious refusal of the defendant to pay the policy, but they were also admissible against plaintiff as prima-facie evidence of the facts therein stated. Stephens v. Metropolitan Life Ins. Co., 176 S. W. 253; Grohmann v. Maccabees, 237 S. W. 875; Grey v. Independent Order of Foresters, 196 S. W. 779; Brotherhood of American Yeomen v. Hickey, 191 S. W. 162; Continental Life v. Learing, 240 Fed. 653; Felix v. Fidelity Mutual Life Ins. Co., 216 Pa. 95; Wasey v. Travelers Ins. Co., 126 Mich. 119. (6) A certified copy of the certificate of insured's death filed with the State Board of Health was admissible in evidence because it was a public document or record. Such a certificate of death is admissible whether the same was made by the attending physician or the coroner. Simpson v. Wells, 237 S. W. 520. (7) The burden of proof is upon the plaintiff, in an action on a policy of accident insurance, to establish that the insured's death was accidental, and not upon the defendant to prove that it was suicidal. Griffith v. Continental Casualty Co., 235 S. W. 83; Brunswick v. Standard Accident Ins. Co., 213 S. W. 689; Lamport v. Aetna Life Ins. Co., 199 S. W. 1020; Laessig v. Travelers Protective Assn., 169 Mo. 272; Bennett v. Standard Accident Ins. Co., 237 S. W. 144; Whitlach v. Insurance Co., 149 N. Y. 45; McAlpine v. Fidelity & Cas. Co., 158 N. W. 967; Gosvenor v. Fidelity & Cas. Co., 168 N. W. 596; Dodder v. Aetna Life Ins. Co., 175 N. W. 651; Federal Life Ins.

Co. v. Wilkes, 218 S. W. 59; U. S. Fid. & Guaranty Ins. Co. v. Blum, 270 Fed. 946; Taylor v. Pacific Mut. Life Ins. Co., 110 Iowa, 621; Fidelity & Casualty Co. v. Weise, 182 Ill. 496; Carnes v. Traveling Men's Assn., 106 Iowa, 281; Merrett v. Accident Assn., 98 Mich. 338. (8) The instructions requested by defendant were not repetitions. Repetitious instructions will only constitute error where they are so numerous as to bewilder or confuse the jury. Daken v. Chase & Son Merc. Co., 197 Mo. 238; Huss v. Heydt Bakery Co., 210 Mo. 44.

RAGLAND, J.—This is the second appeal in this case. It is a suit on a policy of insurance issued by defendant, whereby it, among other things, insured Harry C. Griffith against death suffered through personal bodily injury effected directly and independently of all other causes through external, violent and purely accidental means. It contained, however, this stipulation: "If the insured shall sustain loss of life by suicide or self-destruction, while either sane or insane, and such loss of life shall result within ninety days of the injury causing it, the company will pay one-tenth of the principal sum."

The policy is dated July 8, 1910, and by reason of accumulations therein provided for, through annual renewals, the amount payable under it in 1919, in case of the insured's death through accidental means, was $15,000. The plaintiff is the beneficiary named therein.

The cause was tried on the same pleadings as in the former trial. The petition, after alleging the execution of the policy and its provisions as above indicated, except that it made no reference to the stipulation relating to suicide, stated:

"That thereafter on the 21st day of April, 1919, the said Harry C. Griffith received personal bodily injury effected directly and independently of all other causes through external, violent, and purely accidental means by accidentally falling out of a window of a room on the second floor of the St. Louis Baptist Hospital . . .

299 Mo.—28.

to the ground beneath, whereby  .  .  .  he suffered concussion and hemorrhage of the brain, and that as a direct result of his said injuries, the said Harry C. Griffith died on April 22, 1919.''

The petition further charged a vexatious refusal to pay, and prayed judgment for damages and attorney's fees in addition to the said sum of $15,000.

The answer admitted the execution of the policy, in the terms and of the tenor alleged, and the death of Griffith, but denied the other allegations of the petition. It further averred that the death of Griffith was due to suicide and self-destruction, that the policy stipulated that in such event the defendant's liability should be $1,500 and no more, and that it brought into court and thereby tendered that sum. Plaintiff filed a general denial by way of reply.

The facts in proof are substantially the same as on the former trial. · The plaintiff in this trial, however, contented herself with raising the curtain on the scene disclosing the insured's fall at the stage where he was seen hanging from the hospital window, head downward, with a nurse holding him by one foot, leaving it to defendant to show, if it chose, the circumstances immediately preceding whereby the insured got himself into such dilemma. Her evidence in chief tended to show the following: Griffith, the insured, was in the employ of the Anderson Grocery Company of St. Louis, and engaged in the performance of office duties. He was about fifty years of age, a small, thin-built man, with sallow complexion. He was not talkative and was particularly reticent about his own affairs. Seven or eight years prior to his death he had been discharged in bankruptcy, and after that time had had no financial difficulties. Neither his wife nor his business associates had ever noticed any despondency on his part, nor had they ever heard him say anything about killing himself or committing suicide. On April 16, 1919, he suffered a gun-shot wound, the bullet entering near the left mammary nipple and passing through his body.

He was taken to the City Hospital, and during the time he remained there he was strapped to his cot. On April 19th, he was removed to the Baptist Hospital and put in a small room known as No. 18. There was a window in the north side near the west wall of the room, and a door in the south side somewhat east of the center. Along the west wall and about two feet south of the window in the north side there was a radiator. The bed was placed between the door and the window with the head against the west wall. The window sill was two feet from the floor, and was twenty inches in width from inside to outside. The window itself was two feet and ten inches wide. From the sill to the top of the bottom sash was three feet, two and one-half inches; from the sill to the street surface below the distance was eighteen feet.

On the night of April 20th, about 12:30 a. m., two young men, Harrison and Zoller, were passing along the street near the hospital when they heard an indistinct cry for help. They looked toward the hospital and saw something hanging from a second story window which appeared to be bed clothing, but which on closer inspection proved to be a man hanging with his head down. They ran toward the place, and as they got closer they saw that the man's entire body was out of the window except his left foot and ankle, by which he was being held by a nurse; his back was against the wall and he was turning first one way and then the other and pushing up and reaching out with both hands. His apparent struggles had ceased, however, and he was hanging perfectly limp when they reached the place. Presently the nurse let go of him and he fell to the ground his head striking a cellar door. The man who had fallen was Griffith, the insured; he was carried back into the hospital, put to bed and strapped to his cot. On April 22nd he died. The autopsy disclosed that the immediate cause of his death was hemorrhage of the brain. It also disclosed that his left lung at the apex, and the upper and lower lobes of the right lung, were tubercular, and that both were bound down by chronic adhesions.

The following excerpts from the testimony of defendant's witnesses epitomize the evidence offered by it for the purpose of showing that the death of the insured was not effected through accidental means:

Ella Diehl: "I was Mr. Griffith's stenographer and had been for about a year. He usually went to lunch, I guess, about twelve. On the 16th of April referred to he did not go to lunch. He just passed a remark to me that he was feeling rotten. About two o'clock he called me and asked me if I had an oil can, and I saw he had a revolver lying there and I got the oil can. I had seen the revolver there before and that didn't alarm me, and so I gave the oil can to him and went away from his desk. A little while after he called me to take the oil can away, and said, 'The trigger won't work.' I said, 'You ought to take that thing away and oughtn't to have that down at the office.' He didn't answer and I started to go away and just as I turned around I heard the revolver. I noticed I didn't take more than about three steps. At that time he was sitting at his desk in a revolving chair. He was sitting sort of hunched over with his feet under his desk. The gun was on the edge of his desk with the muzzle towards him. It was just about directly in front of him. When I heard the report and turned he was just keeling back in his chair. He made no outcry at all and was smoking a cigar. When I turned around he had a cigar clenched in his teeth. I immediately left the office."

Mrs. Minnie Williamson: "I have been a nurse at the St. Louis Baptist Hospital for eighteen months and was in April of last year. I was head nurse in the little surgical division on the third floor. I received Harry C. Griffith. He went out of the window the second day he was there. Mrs. Griffith came to the hospital with him. I had the care of him in the daytime. I fed him and bathed him and made him comfortable. He was very emaciated. His wound seemed to progress satisfactorily. I had conversations with Mr. Griffith several different

times. When I went to give him his bath he told me to be careful. He said 'I have a wound in my side, a gunshot wound.' I said, 'An accident, I suppose,' and he said, 'Well, anyone in my condition would be better off dead.' That is the first conversation he held with me. At times, when I would feed him, he would say he would be better off dead. He didn't seem cheerful to me. Just when I went to feed him he would always complain of feeling so badly and he would be better off dead. After he went out of the window I had very little conversation with him. I came on duty at seven o'clock the next morning, and went to this Room 18 as soon as I came on duty. The lower window sash was up about a little over half way, I should judge. I closed it. During the day he said very little. He would just ask me for what he wanted. I didn't ask him how he came to get out of the window and he didn't tell me. He had been tied in the bed and he was practically untied, and I and Mr. Carney tied him over again.''

Mrs. Sidney Bonham: ''In April, 1919, I was a nurse at the St. Louis Baptist Hospital. I knew Harry C. Griffith as a patient there. He was in Room 18 on Sunday night, April 20th. I was working on the floor opposite Mr. Griffith's room. . . as I passed his door I noticed it was closed and I opened it, and he was seated in front of the window with his feet on the window sill and his back towards the door. He was smoking and I asked him what he was doing up and he said smoking. I insisted on his going back to bed, and he said, 'Go on out and close the door, there's a devil of a draft on me.' I said I realized that, but I said you will have to go back to bed, and he raised up and stood facing me, and I asked him again to go back to bed and he refused, and I started over to him, and he sat down on the window sill and bent over towards the right and went out of the window. I hollered to him and grabbed him by the bath robe. I saw his hands come up, so then I laid across his limbs and got him by the left ankle. I held him there and hollered for

help, and there were two gentlemen walking across the street, and the second time I hollered they turned around and looked, and the third time they came over and I told them to knock on the clinic door for the nurses in the basement, and one of them climbed up to the window sill, but I don't know if he got hold of Mr. Griffith or not. I was holding on to his leg, and he was hanging with his head down and back to the wall. He did not say anything after he went out of the window. The bed was in the center of the room with the head to the west and in going around I had to go to the east of the foot of the bed when I entered the room. The lower sash of the window was about one-half way up. When he sat down in the window sill I can't tell exactly where the lower part of the sash was, but it was about to his shoulders. . . When he sat down he leaned to the right. That would be towards the radiator. I can't say just what the space was between the radiator and the window, but it wasn't very far. He just kind of bent over, put his head under and went out of the window. When I was standing there and talking about his going back to bed he seemed perfectly rational and answered me correctly.

"When I insisted on his going back to bed he refused. . . . I didn't touch Mr. Griffith while he was sitting in the window. He did not say anything before he went out the window backwards. He refused to go back to bed. He was not under the influence of ether. I can't say if he had been unconscious any time that day. He talked very reasonable to me. He just went out backwards, and I just got there in time to grab his bathrobe. As soon as he sat in the window and I started to turn, then he went out of the window. .

"Q. Did it look as if he threw himself out of this window? A. It looked as if he sat down in the window and went out backwards.

"Q. What was the position of the lower sash of this window? A. Well, it was ordinary size.

"Q. What was its position at this time when he sat

on the window seat? A. He sat with his back out of the window.

"Q. Was the lower sash of the window up as far as it would go? A. Yes.

"Q. With reference to the top of his head as he was sitting in the window, how far away was the top of his head from the bottom of the window when it was raised up? A. I can't say, but I think it would be right about his shoulders."

Dr. Joseph B. Chiles: "I treated him for pulmonary tuberculosis. I treated him in 1913. From the date of the card I treated him off and on and until his death. I told Mr. Griffith that he had tuberculosis. . . .

"Q. What did he say? A. He said that he didn't think life was worth living, or words to that effect, and that he might as well jump in the river or jump off a bridge, or something to that effect. . . . I treated him for tuberculosis after 1914 and told him about being afflicted with tuberculosis; then it was that he said he might as well jump off the bridge. I don't recall that he expressed that sentiment after that time. After that I had tests made and the results were negative; that is, the sputum contained no tubercular germs, and it is the opinion of the medical profession that an examination of the sputum is conclusive on that. . . . If a person has tuberculosis it involves to a certain degree destruction of the lung, and if on treatment the disease is stopped that leaves a scar on the lung, but it heals up under favorable conditions."

A card filed by Dr. Chiles with the Health Commissioner of the City of St. Louis, on July 21, 1914, reporting that Harry Griffith, Edison Hotel, 18th and Chestnut Streets, was afflicted with pulmonary tuberculosis was put in evidence by defendant.

Defendant introduced in evidence the proofs of death furnished it by plaintiff. These contained among other things, the affidavit of the attending physician and the verdict of the coroner's jury. This question and answer

appeared in the affidavit: "How is injury said to have been caused? Jumping out window to street." The verdict just mentioned was in part as follows:

". . . We find that the deceased came to his death on the 22nd day of April, 1919, at about 5:30 o'clock a. m., at St. Louis Baptist Hospital, from Shock and Injuries (Hemorrhage of Brain) caused by throwing himself out of a window, second story, at above place on the 21st day of April, 1919, at about 1:50 a. m."

Defendant also offered a certified copy of the certificate of death filed with the Bureau of Vital Statistics, which contained the following:

"I hereby certify that death occurred 6 a. m. The cause of death was as follows: Shock and injuries (Fractured skull) Jumped from window. Contributory (secondary) suicide.

"H. W. FATH, Deputy Coroner."

Plaintiff duly objected to the admission of the testimony of Dr. Chiles, on the ground that it involved confidential communications between physician and patient. On similar grounds she objected to the reception in evidence of the report card filed with the Health Commissioner of St. Louis. In this connection it should be further stated that on cross-examination of the president of the Anderson Grocery Company, a witness for plaintiff, he denied any knowledge of Griffith's having had tuberculosis. He was then asked if he had not been directed by the City Health Commissioner to take certain sanitary precautions on account of a report that had been filed with his department to the effect that Griffith was suffering from tuberculosis. Over plaintiff's objection he was required to answer, and answered in the affirmative. On cross-examination of plaintiff's witness Harrison, he was asked by defendant whether Griffith was struggling any as he was hanging out of the window. His answer in part was: "On first arriving there he was fully unconscious, in my opinion; no motion at all." This part of the answer was striken out on motion of defendant as

being a conclusion of the witness. Plaintiff at the time excepted to the action of the court in so doing. Plaintiff also made timely objections to the admission in evidence of the proofs of death including the copy of the coroner's verdict, and the death certificate issued by the Bureau of Vital Statistics.

At the request of the defendant the court gave among others the following instructions:

"4. The jury are instructed that a finding by them that the death of the insured was due to an accidental fall, instead of an intentional fall, cannot rest upon conjecture or guess on the part of the jury, but must be found by the jury from the evidence in the case, and the burden of proving that the fall was accidental rests on the plaintiff. If the plaintiff has not proven that it was accidental, or if, under the evidence, the jury cannot ascertain whether it was accidental or intentional, then they cannot find for the plaintiff in the full amount sued for on the theory that the death was due to accident.

"5. In dealing with the question whether the death of Griffith was due to an accidental fall from the window, or to an intentional fall, the jury are instructed that the burden of proof is on the plaintiff to prove, by a preponderance or greater weight of the testimony, that this fall was accidental. If, therefore, the jury believe from the evidence that it was intentional, or if under the evidence, the jury are unable to ascertain whether it was accidental or intentional, then they cannot find for the plaintiff in excess of fifteen hundred dollars and interest."

By other instructions the court withdrew from the jury the question of vexatious refusal to pay, and also withdrew from their consideration the proofs of death heretofore referred to.

The jury returned a verdict in favor of plaintiff for $1500 with interest, which under the court's instructions was tantamount to a finding that the insured's death was not caused by accidental means.

From a judgment rendered in accordance with the verdict plaintiff prosecutes this appeal. Other pertinent

matters, both evidentiary and procedural, will be noted in the course of the opinion.

Appellant assigns error: (1) on the rulings with respect to the admission of evidence; and (2) in the giving of the instructions quoted.

I. (1) The only fact appearing in the testimony of Dr. Chiles with respect to which he was incompetent to testify was the fact that Griffith had had tuberculosis for a considerable length of time before his death. That fact, however, was established by the plaintiff's evidence in chief before Chiles was called to the witness stand by defendant. It is not perceived how she could have been prejudiced by further evidence of such fact, even though it came from a prohibited source. Chiles was not incompetent to testify to Griffith's statement, that he didn't think life worth living and that he had as well jump in the river, for the simple reason that it was not information necessary to enable him to prescribe for Griffith as his patient. This much clearly appears from Chiles's testimony as a whole. But even if the physician had been incompetent to testify to this statement made by his patient, because of the remainder of his testimony, no particular harm could have resulted from it. He further stated that Griffith never afterward expressed any such sentiment of despondency, and that after a year and a half's treatment the progress of the disease, as shown by conclusive tests, had been stayed.

*Physician as Witness.*

Appellant further complains that this threat to commit suicide, if it may be so called, was too remote to have been admissible in evidence, but she made no such objection when it was offered on the trial.

(2) It is insisted by respondent that the testimony elicited from plaintiff's witness Anderson, that he had been directed by the Health Commissioner to take certain precautions because a report had been made to him that Griffith had tuberculosis, was proper cross-examination,

in view of the witness's previous denial that he

**Health Report.** had any knowledge of Griffith's ever having been afflicted with that disease. It further claims that the report card filed with the Health Commissioner by Chiles was a public record and as such admissible in evidence. We need not pass upon these contentions. In view of what has been said in the preceding paragraph it is apparent that the reception of both bits of evidence was in no way prejudicial to plaintiff's case.

(3) If a witness has had means of personal observation, and the facts and circumstances upon which he bases his conclusion are incapable of being detailed intelligibly so as to enable any one but the observer

**Conclusion of Witness.** server himself to form an intelligent conclusion from them, he may state his conclusion as the ultimate fact. Such conclusions are sometimes denominated "short-hand rendering of facts." But it is evident, all the circumstances considered, that the witness Harrison did not have sufficient means of observation to enable him to form an intelligent opinion as to whether Griffith was unconscious. His opinion to that effect was therefore nothing more than conjecture; it was gratuitously given and was properly stricken out by the court.

(4) When the proofs of death were offered by defendant the court announced that they would be admitted as bearing on the issue of vexatious refusal to pay, and for no other purpose; when it withdrew that issue from the jury it also instructed them to disregard this evidence. These documents were clearly competent for the purpose for which they were admitted; but even if they had been improperly received, the error was cured by the instruction withdrawing them from the consideration of the jury.

(5) The copy of the death certificate certified by the State Registrar of Vital Statistics was under the statute (Sec. 5816, R. S. 1919) competent evidence of the facts therein stated. [Simpson v. Wells, 237 S. W. 520.]

II.   Under the pleadings the issue was: was the insured's death effected through accidental means? [Griffith v. Continental Casualty Co., 235 S. W. 83, 84.]   It was affirmed by the plaintiff and denied by the defendant. It is elementary that the burden of proof rests upon the party having the affirmative of an issue, and that that burden never shifts.   ''The burden of proof to establish the affirmative of an issue involved in an action rests upon the party alleging the facts constituting the issue, and remains there until the end.''   [10 R. C. L. 898, and cases cited in note 15; Griffith v. Continental Casualty Co., supra; Downs v. Horton, 230 S. W. 103.]   These rules of procedure are all but axiomatic.   That it was incumbent upon the plaintiff in this case, in order to establish defendant's liability, to prove by the greater weight of the evidence that the fall from the window which resulted in insured's death was accidental is therefore not even a debatable proposition.   That such burden rested upon her throughout the trial is likewise indisputable.

But it is said that the applicability of the fundamental rules of procedure above referred to is in this case modified or destroyed by the presumption against suicide which arises on the evidence.   This insistence is based upon a misconception of the nature and office of such a presumption.   The presumption against suicide is a rebuttable legal presumption.   [Brunswick v. Ins. Co., 278 Mo. 154, 213 S. W. 50.]   In its character as a presumption it is not evidence, it is a mere rule of law which operates to throw upon the party against whom it is raised the duty of going forward with the evidence.   [Thayer, Prel. Treat. Ev. 314-346.]   It performs no other function and has no other significance.   ''A presumption has only the effect of throwing upon him against whom it is raised the burden of proceeding with his proof, but not shifting the general burden of proof in the case, . . .   so soon as he discharges his burden, that is to say, adduces contrary evidence, the presumption vanishes entirely.''   [1 Jones, Comm. on Evidence, sec. 10f.]   We therefore re-

peat what we said when the case was here before: "That the insured's death was effected through accidental means was the one essential fact upon which defendant's liability could be predicated; it was affirmed by plaintiff and denied by defendant; it is elementary, therefore, that the burden was upon her to establish this fact by the greater weight of the evidence. Plaintiff undertook this burden and by her evidence showed that the body of the insured . . . dropped to the pavement below under circumstances so equivocal that it would have been extremely difficult for the triers of facts to have determined from them alone . . . whether his death was accidental, or whether it was the result of an act intentionally done by him for the purpose of ending his life. Notwithstanding, this proof, aided by the presumption arising from the love of life, was sufficient to make out for plaintiff a prima-facie case, and thereupon the burden of going forward with the evidence devolved upon defendant. Defendant's evidence . . . tended to show that the insured intentionally precipitated himself from the window. With the facts all before the jury, the presumption against suicide had no further procedural purpose to serve. The burden of proving accidental death still rested upon plaintiff, as it had done from the inception of the trial."

If the jury after hearing all the evidence were unable to tell whether insured's fall was accidental, or intentional, it was because plaintiff had failed to discharge the burden resting upon her of showing by the greater weight of the evidence that it was accidental. And it was just as necessary in this case as in any other that an affirmative finding should be based upon evidence, and not upon guess or conjecture. But it is claimed that the phrasing of Instruction No. 4 in this respect deprived plaintiff of the benefit of the presumption against suicide. As already pointed out the presumption was not evidence to be considered by the jury, but a rule of law to guide the court, and it had served its purpose and gone out of the case when the case was submitted to the jury. While the

"presumption" was gone, there remained of course the biological fact that all normal human beings love life and shrink from death. The recognition of the existence of this fact is a part of common knowledge. There was nothing, however, in either of the instructions that precluded the jury from weighing all the facts and circumstances in evidence in the light of this further fact, the instinct of self-preservation. It might have been proper for the court to have so instructed the jury, had it been requested to do so. But as that question is not in the case it would avail nothing to express an opinion with respect to it.

In view of what has been said it is obvious that no error was committed in giving instructions numbered 4 and 5. Other complaints are made in regard to the instructions as a whole, but they are not of sufficient merit to require discussion.

The record disclosing no reversible error, the judgment should be affirmed. It is so ordered. All concur, except *Woodson, C. J.,* who dissents.