Nola COPE, Plaintiff-Appellant,

v.

Jimmy THOMPSON, a Minor, by Harry Thompson, his father and guardian ad litem, Defendant-Respondent.

No. 9289.

Missouri Court of Appeals,
Springfield District.

March 12, 1976.

Motion for Rehearing or to Transfer to Supreme Court Denied March 25, 1976.

Application to Transfer Denied
April 14, 1976.

Donald E. Bonacker, Springfield, for plaintiff-appellant.

Schroff, Keeter & Glass, Bob J. Keeter, Robert W. Schroff, Springfield, for defendant-respondent.

STONE, Judge.

A school holiday on November 27, 1970, became a Black Friday for high school student Jimmy Thompson, defendant herein, and more tragically so for Elmer Cope and his family, when a 1970 Plymouth Roadrunner driven by defendant, the sole occupant thereof, crashed into the left side of a 1965 Ford two-door automobile resulting in the death of Mr. Cope, the sole occupant of that vehicle, before any third person reached the scene. In this jury-tried action, plaintiff Nola Cope, the widow, sought damages of $50,000 for the wrongful death of her husband. Cast by an adverse judgment entered on a jury verdict for defendant Thompson, plaintiff appeals.

Defendant, seventeen years of age at the time of accident, lived in his parental home on Route E in Wright County, Missouri. His regular activities included milking the cows on the home place and attending high school at Mountain Grove. He had been driving about three months prior to the date of accident. During that period, he frequently operated his parents' Cadillac or the 1970 Plymouth Roadrunner owned by an older married brother, Larry, who also resided in the parental home. The Plymouth was equipped with "oversized" Goodyear G–70 tires, which had been "taken off" another brother's "new car." The "steering" and the "brakes" on the Plymouth were "in good condition," and it was also

"in good mechanical condition." Using his brother Larry's Plymouth on the fateful morning of accident, defendant first called on a girl he "was going with . . . at the time" and then visited "a little bit" at the home of his grandmother, after which he headed for his home eastbound on Route E. It was then between 11:30 A. M. and noon on a cloudy but "dry" day.

At and near the point of collision, Route E was an east-west highway with a 20-foot bituminous blacktop roadway, the center of which was not lined or otherwise marked. There was no useful shoulder on either side, and approximately "a foot" from each edge of the blacktop, the ground sloped downward into a ditch "about two foot deep." The collision occurred on the blacktop roadway "at the mouth" of a one-lane dirt driveway into a field on the south side of the highway. This field was a part of the farm on which Mr. and Mrs. Cope had resided for many years prior to the accident, and the hay, which he fed to his cows, was stacked there. From postaccident observation of the damaged Cope automobile and the numerous fragments of hay on that vehicle and scattered around the point of collision, plaintiff's witness Rippee, a neighbor who heard the crash and was the first person to reach the scene, opined (without objection) that Mr. Cope had "come out of the driveway" and "had started to feed" his cows at another location.

Route E was straight for a distance of about a half mile west of the point of collision, the direction from which defendant Thompson approached. An eastbound driver such as defendant entering the west end of this half-mile stretch descended into a "valley or swale area" and then ascended an incline to the gently-rolling crest, from which the highway sloped gradually downward to the east for a considerable distance. The field driveway used by Mr. Cope entered the south side of Route E on this downgrade. Although the topography of that area thus limited Mr. Cope's sight distance to the west and defendant's sight distance to the east, plaintiff's professional photographer Craig testified that, at a point determined by measurement to have been 270 feet west of the field driveway, an eastbound driver such as defendant could have seen "approximately six inches" of the top of an automobile at that driveway, and defendant's photographic witness Comstock "stepped off" 210 feet as the intervening distance at which the top of an eastbound automobile such as defendant's Plymouth approaching the hillcrest would have become visible initially to the driver of an automobile, such as the Cope Ford, in the center of Route E opposite the mouth of the field driveway.

When asked upon trial to state the speed at which he had been traveling as he "approached the Cope home [and] the area where the mishap occurred," defendant Thompson, the sole surviving eyewitness to the accident, recollected that "I said in my deposition the other day [three days prior to trial] I was going 50 to 55" miles per hour—an answer for which his counsel shortly developed defendant's explanation that when he last "glanced at my speedometer maybe two or three miles back . . . I was going around 50 or 55" and the subsequent elaboration that "I think as I come down that slope before I hit that dip in the road [the valley or swale area] where you come upon the crest I might have been going up to 59, 60, I don't think I was going over 60 miles an hour."

Whatever his speed then may have been, defendant declared that, when he first saw the Cope automobile (and that was, so he avouched, as soon as it became visible to an eastbound driver), it "was stopped" headed north, crosswise of, "straight across," and entirely on, the blacktop roadway with the back bumper of the automobile "a foot or two" north of the south edge of the blacktop at the mouth of the field driveway, and with the front bumper a similar distance south of the north edge of the blacktop. In short, defendant declared the Cope automobile "was parked in the road in my way there" and "he [Mr. Cope] didn't seem to

look at me or nothing." Immediately reacting to the situation confronting him, he "hit the brakes" and locked all four wheels of the Plymouth so that they laid down four distinct "lines or skidmarks" 120 feet in length. Generally speaking, all of these skidmarks ran (so Trooper Watson said) "parallel to the road." More specifically, Archie Lawson, plaintiff Nola Cope's brother who, with plaintiff's son, Don Cope, made measurements at the scene of the accident, stated that the skidmark nearest to the south edge of the blacktop roadway (the right side for defendant's eastbound Plymouth) began approximately 4 feet 7 inches from the south edge and, over the 120-foot length of that skidmark to the point of accident, gradually veered about three feet to the left or to the north.

The numerous pictorial exhibits clearly indicate that, with defendant's Plymouth thus angling slightly to the left or to the north, the *initial* impact was between the right front portion of the eastbound Plymouth and the left door of the Cope Ford, instantaneously followed by violent damaging contact between the entire front end of the Plymouth and that portion of the left side of the Ford in front of the point of initial impact. As a result of the collision, defendant's Plymouth spun around counterclockwise "one complete turn [revolution]" and "another half-turn" and came to rest on the dry blacktop roadway headed in a southwesterly direction with its left front wheel near the south edge of, but still on, the blacktop. The impact of the collision catapulted the Cope Ford toward the northeast, and it came to rest headed in that direction on the north side of Route E with the front end of the Ford against the wire fence on that side of the highway and the right rear "approximately 25 feet" from the north edge of the blacktop roadway (so plaintiff's witness Short testified) or 21 feet from the right rear of defendant's Plymouth (according to Trooper Watson).

In addition to the damage to the Cope Ford two-door clearly visible in the photographic exhibits, postcollision examination of that vehicle by witness Don Cope, then a route salesman for a Springfield bakery and formerly a transport driver, disclosed that the left door of the Ford tudor was "caved in . . . approximately 30 inches," the left side of the frame was broken about the center of that door, the transmission was "busted," and the motor support was "knocked loose." Plaintiff's neighbor Rippee, who heard the crash and reached the scene within two or three minutes, found Elmer Cope dead in the front seat of his Ford. The death certificate discloses that he sustained "severe lacerations to left side of head & neck" and that the "immediate cause of death" was a "fractured neck."

On this appeal, five points have been properly presented in plaintiff-appellant's brief and ably argued by counsel for both parties. Additionally, defendant-respondent insists there was insufficient evidence to support either of the assignments of negligence disjunctively submitted in plaintiff's verdict-directing instruction 3, i. e., that defendant drove at an excessive speed or drove on the wrong side of the road. We initially consider this contention because, if plaintiff did not make a submissible case, trial errors would become wholly immaterial. *Wills v. Townes Cadillac-Oldsmobile, Inc.,* 490 S.W.2d 257, 258(1) (Mo.1973); *Osborn v. McBride,* 400 S.W.2d 185, 188(1) (Mo.1966); *Walker v. Niemeyer,* 386 S.W.2d 87, 92(3) (Mo.1965); *Howard v. Johnoff Restaurant Co.,* 312 S.W.2d 55, 56(1) (Mo. 1958).

*Of submissibility on excessive speed.* In this inquiry, we view the evidence in the light most favorable to plaintiff, accept it as true if it is not entirely unreasonable or opposed to physical law, accord her the benefit of all reasonable inferences arising from the evidence, reject all inferences unfavorable to her, and disregard defendant's evidence except as it may aid plaintiff's case. *Todd v. Watson,* 501 S.W.2d 48, 50 (Mo.1973); *Forbis v. Associated Wholesale Grocers, Inc.,* 513 S.W.2d 760, 763(1) (Mo. App.1974); *Van Brunt v. Meyer,* 422 S.W.2d

364, 370(7) (Mo.App.1967). We also bear in mind that a jury may believe all or none of the testimony of any witness, or may accept it in part and reject it in part [*Hinds v. Kircher,* 379 S.W.2d 607, 610(3) (Mo.1964); *Kickham v. Carter,* 314 S.W.2d 902, 905(1), (Mo.1958); *Bridgeforth v. Proffitt,* 490 S.W.2d 416, 423 (Mo.App.1973); *Jordon v. Johnson,* 411 S.W.2d 451, 454(1) (Mo.App. 1967)], and that this prerogative embraces the right to disbelieve testimony even though it be unimpeached and uncontradicted. *Mayer v. Orf,* 404 S.W.2d 733, 735(4) (Mo.1966); *Robinson v. St. John's Medical Center, Joplin,* 508 S.W.2d 7, 11(3) (Mo.App. 1974).

■ The only eyewitness testimony concerning the speed of the eastbound Plymouth when it reached the point at which defendant could have initially sighted the Cope automobile "parked" crosswise of the two-lane blacktop roadway and blocking both traffic lanes was that of defendant himself who, upon trial, testified that he "might have been going up to 59, 60" but did not "think" he was traveling faster than that. Of course, the jury was not obliged to accept this hesitant, uncertain testimonial offering by defendant [*Schneider v. Prentzler,* 391 S.W.2d 307, 309(1) (Mo.1965); *Haymes v. Swan,* 413 S.W.2d 319, 324(3) (Mo.App.1965)]; and, as we shall proceed to point out, in our appellate view of the case the highest speed of 60 miles per hour suggested by defendant did not fit into, and was not harmonious with, the remainder of the evidential mosaic developed upon trial.

■ By unqualified affirmative answers of "Yes" to leading questions on direct examination, defendant unequivocally confirmed the interrogative summation of his counsel that "[a]s soon as it [the Cope Ford] was visible you [defendant] saw it" and "[a]s quick as you could react you got on the brakes." Relating these assurances to the record, the triers of the facts could have found that eastbound defendant saw the Cope automobile when the intervening distance between the two vehicles was as long

as the 270 feet determined by plaintiff's witness Craig to have been the sight distance available to an eastbound driver and certainly no shorter than the 210 feet "stepped off" by defendant's witness Comstock as the sight distance to the west available to a driver in Mr. Cope's position, and that as quickly as defendant could react he "hit the brakes" and locked all four wheels of the Plymouth. If defendant had been traveling at 60 miles per hour when he sighted the Cope automobile, he would have moved 66 feet during the reaction time of ¾ second assumed in the absence of evidence on this subject [*Roach v. Lacho,* 402 S.W.2d 344, 350(10) (Mo.1966); *Koogler v. Mound City Cab Co.,* 349 S.W.2d 233, 237(6) (Mo.1961); *Martin v. Sherrell,* 418 S.W.2d 209, 213 (Mo.App.1967)], and thus, when he "hit the brakes" and locked all four wheels, the Plymouth still would have been some 204 to 146 feet from the "parked" Cope automobile.

■ Witness Don Cope offered experimental testimony from which it reasonably might have been inferred that, if defendant had been traveling no faster than 60 miles per hour when he sighted the Cope automobile, he could have brought his Plymouth to an absolute stop well within the 204 feet which, in the most favorable view of the evidence from plaintiff's standpoint, was available for braking action after the lapse of reaction time. And, since an appellate court may take judicial notice of the *limits,* although not the *precise distance,* within which an automobile may be stopped under given conditions [*Jones v. Fritz,* 353 S.W.2d 393, 396–397(5) (Mo.App.1962); *Highfill v. Brown,* 340 S.W.2d 656, 664(10) (Mo. banc 1960); *Nelms v. Bright,* 299 S.W.2d 483, 490(17) (Mo. banc 1957); *Eaves v. Wampler,* 390 S.W.2d 922, 930(17) (Mo.App.1965), we reasonably might be permitted judicial knowledge that, under the conditions shown in evidence, defendant's Plymouth moving at 60 miles per hour could have been braked to a stop within a distance of 204 feet. See *Autrey v. Swisher,* 155 F.2d 18, 21–22(7) (5th Cir. 1946); *State v. Arena,* 46 Hawaii

315, 379 P.2d 594, 609–610(20), 20 A.L.R.3d 450 (1963). However, we do not here declare or rely upon such judicial knowledge.

■ Excessive speed need not be shown by direct testimony but may be proved by circumstances. *Russell v. Kotsch,* 336 S.W.2d 405, 409 (Mo.1960); *Rakestraw v. Norris,* 478 S.W.2d 409, 416(11) (Mo.App.1972). As we have noted supra, if defendant had been traveling at 60 miles per hour when he sighted the Cope Ford and if, as quickly as he could react (assumed to have been ¾ second during which he would have moved 66 feet), he had "hit the brakes" and locked all four wheels of the Plymouth, that vehicle then would have been within the range of 204 to 146 feet from the "parked" Cope automobile. However, the solid uninterrupted skidmarks laid down by the Plymouth were only 120 feet in length, from which the triers of the facts reasonably could have found that the Plymouth had reached that point when defendant locked the wheels, and hence that during defendant's reaction time of ¾ second the Plymouth had traveled substantially farther than the 66 feet it would have traversed at 60 miles per hour and thus had been moving at a materially higher rate of speed than 60 miles per hour when defendant initially sighted the Cope Ford.

Furthermore, the jurors had before them relevant evidence that, after the Plymouth had skidded for 120 feet on the dry blacktop roadway, that vehicle was still moving at such speed that the left door of the stationary Cope Ford (crosswise of the roadway) was "caved in . . . approximately 30 inches," the left side of the frame and the transmission were broken, the motor support was "knocked loose," the Ford was propelled in a northeasterly direction for a considerable distance as hereinbefore outlined, and the Plymouth driven by defendant spun around "one complete turn" and "another half-turn." With all of the foregoing circumstances before them, we are firmly of the opinion that the triers of the facts reasonably could have inferred and found that defendant was traveling at an excessive speed and that this was the proximate cause of the collision. *Marshall v. Bobbitt,* 482 S.W.2d 439, 442–443(1–3) (Mo. 1972); *Wehrkamp v. Watkins Motor Lines, Inc.,* 436 S.W.2d 698, 702–703, 709 (Mo. 1969); *Wolfe v. Harms,* 413 S.W.2d 204, 210(5–7) (Mo.1967); *Russell v. Kotsch,* supra, 336 S.W.2d at 409(4); *Lyon v. Southard,* 323 S.W.2d 785, 787(1, 2) (Mo.1959).

*In her fifth point,* plaintiff assigns error in the giving of defendant's instruction 4, which submitted in the disjunctive two alleged acts of contributory negligence on the part of Mr. Cope, to wit, that he stopped his automobile in a lane reserved for moving traffic or failed to yield the right-of-way. Unless sufficient evidence supported the submission of both acts, the giving of that instruction constituted error. MAI 17.02, Notes on Use; *Wolfe v. Harms,* supra, 413 S.W.2d at 209–210(1); *Robertson v. Grotheer,* 521 S.W.2d 452, 459 (Mo.App.1975); *Shelton v. Bruner,* 449 S.W.2d 673, 676 (Mo. App.1969). The submissibility of the charge that Mr. Cope stopped in a lane reserved for moving traffic is not challenged but plaintiff vigorously insists that the disjunctive charge of failure to yield the right-of-way was not submissible.

■ In moving from the field driveway onto Route E, Mr. Cope was subject to the duty imposed by § 304.351(5), RSMo 1969, V.A.M.S., that "[t]he driver of a vehicle about to enter or cross a highway from . . . any private road or driveway shall yield the right-of-way to all vehicles approaching on the highway to be entered." The duty to yield the right-of-way imposed in other situational categories by subsecs. 3 and 4 of § 304.351 is limited to approaching vehicles *so close "as to constitute an immediate hazard"* whereas, if taken literally, subsec. 5 would impose a duty to yield, without limitation, "to all vehicles approaching on the highway to be entered." (All emphasis herein is ours.) Pointing out that subsec. 5 "does not even contain 'is so close as to constitute an immediate hazard,' " defendant's counsel confidently,

albeit mistakenly, declare in their brief that "[h]ere the jury must only find that [Mr. Cope] entered the highway when defendant was approaching." For, although subsec. 5 is thus absolute on its face, our appellate courts have construed this subsection reasonably and realistically with other subsections of § 304.351 and have held subsec. 5 likewise contemplates and requires that a driver about to enter or cross a highway from a private road or driveway must yield the right-of-way to all vehicles on said highway approaching *so close as to constitute an immediate hazard. Taylor v. Schneider,* supra, 370 S.W.2d at 728–729(5); *Johnson v. Bush,* 418 S.W.2d 601, 604–605(3) (Mo.App. 1967); *Colby v. National General Ins. Co.,* 490 S.W.2d 323, 326–327 (Mo.App.1973).[1]

As Mr. Cope was about to enter Route E from the field driveway, he was required to maintain a careful and vigilant lookout and to take cognizance of such traffic hazards as a very careful and prudent person could and should have seen in the same or similar circumstances [*Johnson v. Bush,* supra, 418 S.W.2d at 604; *James v. Berry,* 301 S.W.2d 530, 533(5) (Mo.App. 1957)]; but that requirement neither imposed an obligation to observe the unobservable by peering *through* the hill to the west of the field driveway or by bending his vision *over* the crest of that hill [*Fuzzell v. Williams,* 288 S.W.2d 372, 376(10) (Mo.App. 1956)] nor charged him with such knowledge as then could have been revealed only by such supernatural and thaumaturgical means.

The evidence adduced upon trial clearly established that neither Mr. Cope nor defendant Thompson could have seen the other's vehicle until defendant's eastbound Plymouth had neared the crest of the hill, more specifically had reached a point which defendant's evidence showed was no more than 210 feet from the field driveway. And the *only* evidence (a) concerning the relative positions of the Cope and Thompson vehicles when either operator could have initially sighted the other's vehicle or (b) as to whether the Cope automobile was then moving or stationary was *the testimony of defendant Thompson that the Cope automobile "was stopped" crosswise of, "straight across," and entirely on the blacktop roadway of Route E* with the back bumper "a foot or two" north of the south edge of the blacktop at the mouth of the field driveway and the front bumper a similar distance south of the north edge of the blacktop. Certainly Mr. Cope could not have been guilty of a statutory charge of failing to yield the right-of-way before he could have seen or become aware of defendant's approaching automobile. See *Tener v. Hill,* 394 S.W.2d 425, 434(13) (Mo.App.1965); *Moore v. Fitzpatrick,* 31 S.W.2d 590, 592(7) (Mo.App.1930).

However, defendant argues that "[s]ince [Mr. Cope] had at least 2–3 seconds after [defendant's] car was visible the jury could reasonably have found that this was sufficient time for him not to have entered *or* having done so to move on through the intersection so [defendant] could have passed safely." As defendant's testimony established, Mr. Cope had entered Route E *before* he could have seen or become aware of the eastbound Plymouth on the opposite

---

1. This construction is in harmony with that accorded right-of-way statutes in other states cast in the same language. E. g., *Irvan v. Jamison Oil Co.,* 205 Va. 1, 135 S.E.2d 153, 156(4) (1964); *Temple v. Ellington,* 177 Va. 134, 12 S.E.2d 826, 828–829(3, 6) (1941); *Pandell v. Hischier,* 166 Cal. App.2d 693, 333 P.2d 762, 763(1) (1959); *Eagar v. McDonnell Douglas Corp.,* 32 Cal. App.3d 116, 107 Cal.Rptr. 819, 822 (1973); *Webb Transfer Lines, Inc. v. Taylor,* 439 S.W.2d 88, 93(6, 7) (Ky.1968); *Reed v. Green,* 90 Idaho 526, 414 P.2d 445, 448– 450(1, 2) (1966); *Heinecke v. Hardware Mut. Cas. Co.,* 264 Wis. 89, 58 N.W.2d 442, 444(2) (1953); *Peterson v. Lang,* 239 Minn. 319, 58 N.W.2d 609, 612–613(5) (1953); *Dwyer v. Christensen,* 77 S.D. 381, 92 N.W.2d 199, 202(4) (1958); *State v. Arena,* 46 Hawaii 315, 379 P.2d 594, 603(9, 10), 20 A.L.R.3d 450 (1963); *Adams v. Dennis,* 171 Kan. 32, 229 P.2d 740, 742 (1951), recognized as controlling authority in *Reimers v. Frank B. Connet Lumber Co.,* 271 S.W.2d 46, 51(5) (Mo.1954), a tort action arising out of a Kansas accident.

side of the hillcrest west of the field driveway, so there was no submissible issue of negligence for failure to yield the right-of-way *before* he entered this T-intersection.

■ In considering the alternative contention that Mr. Cope's alleged failure to yield the right-of-way was submissible on the theory that he had time, after defendant's automobile became visible, "to move on through the intersection so [defendant] could have passed safely," we preliminarily emphasize by reiteration that, when the approach of defendant's Plymouth initially might have become known to Mr. Cope, his Ford was standing crosswise of the paved roadway with its front and rear ends within one or two feet of opposite edges of the blacktop, thus effectively blocking both traffic lanes. As all of the MAI instructions mandated for use in the submission of intersectional right-of-way issues provide, "[t]he phrase 'right-of-way,' as used in these instructions, means *the right of one vehicle to proceed ahead of the other.*" MAI 14.02 to 14.07, incl. See particularly MAI 14.06 for use in cases arising under § 304.351(5).

We recognize that Mr. Cope had a duty to yield the right-of-way not only at his point of entrance from the field driveway but also while proceeding into this T-intersection (as the right-of-way cases frequently put it) "at least to the extent that [he] might then be able *to stop or slacken and let the other car pass.*" [2] However, counsel have not cited and we have not found any reported case in which an appellate court has discussed or ruled the submissibility of alleged negligence in failure to yield the right-of-way *by moving forward through*

an intersection ahead of the vehicle having the right-of-way; and, in our view of the case at bar, we need not undertake to plow this virgin field here. For, if it were assumed for the purpose of discussion only (a) that the duty to yield the right-of-way might be so expanded and (b) that defendant's Plymouth might have been visible to the operator of the Cope automobile for two or three seconds prior to the collision, the evidence in the record before us would not have afforded an evidentiary basis for a finding that during such period Mr. Cope could have moved forward and cleared this T-intersection so that defendant might have passed safely.

■ In fact, the testimony of defendant himself, the only eyewitness to the tragedy, affirmatively and persuasively indicates to the contrary. Returning to that testimony, we find that defendant declared not only that the Cope Ford "was parked" crosswise of the roadway blocking both traffic lanes except for one or two feet on each outside edge of the pavement but also that "*he [Mr. Cope] didn't seem to look at me or nothing.*" For Mr. Cope to have "parked" or stopped voluntarily, consciously and without good cause at the place and in the position described by defendant not only would have constituted gross negligence but also, in effect, would have amounted to an open invitation to disaster and the tragic fate that befell him. However, this would have been an invitation which might not reasonably be attributed to him, in view of his maturity, character, and family life-style as reflected in the record. [3]

Two possible and plausible explanations for the stationary position of the Cope Ford

**2.** *Herr v. Ruprecht*, 331 S.W.2d 642, 648(5) (Mo.1960); *Schaetty v. Kimberlin*, 374 S.W.2d 70, 73 (Mo.1964); *Johnson v. West*, 416 S.W.2d 162, 165 (Mo.1967); *Riley v. Bi-State Transit System*, 459 S.W.2d 753, 756(2) (Mo.App.1970); *Stonefield v. Flynn*, 347 S.W.2d 472, 479(9) (Mo.App.1961).

**3.** The evidence properly may be weighed and considered in the light of the instinct of self-preservation [*Williams v. Planters Realty Co.*, 160 S.W.2d 480, 483(3) (Mo.App.

1942)], since the biological fact that all normal human beings love life and shrink from death is a part of common knowledge. *Griffith v. Continental Casualty Co.*, 299 Mo. 426, 445–446, 253 S.W. 1043, 1048(13) (banc 1923); *Edwards v. Business Men's Assur. Co. of America*, 350 Mo. 666, 680, 168 S.W.2d 82, 90(12) (1943); *Gilpin v. Aetna Life Ins. Co.*, 234 Mo.App. 566, 581, 132 S.W.2d 686, 695(8) (1939).

and the posture of Mr. Cope (as described by defendant) readily come to mind, to wit, (1) that Mr. Cope, then 75 years of age, might have suffered a sudden spell of vertigo or nausea instinctively prompting an involuntary stop, or (2) that, in moving from the field driveway onto the highway, the motor "died" or was "killed" and he had not yet had sufficient time to restart it or had been unable to start it, as was the unfortunate experience of defendant in *Dwyer v. Christensen,* 77 S.D. 381, 92 N.W.2d 199, 201 (1958). Of course, mere possibility and plausibility do not afford an acceptable basis for a judicial finding or judgment, and the foregoing comments have been included only for the purpose of further illustrating that there was no evidentiary basis for a finding on one of the alleged acts of contributory negligence submitted by defendant's instruction 4, i. e., Mr. Cope's failure to yield the right-of-way.

The other four points presented in plaintiff-appellant's brief and argued here are not discussed or ruled because they concern evidentiary matters or motions for mistrial, no one of which is likely to recur upon retrial. For the giving of defendant's instruction 4 erroneously submitting Mr. Cope's alleged failure to yield the right-of-way, the judgment entered on the jury verdict for defendant must be set aside and the cause remanded for a new trial. It is so ordered.

BILLINGS, C. J., concurs.

HOGAN, J., concurs.

TITUS, J., concurs.

FLANIGAN, J., not participating.