**FELDMANN v. CONNECTICUT MUT. LIFE INS. CO. OF HARTFORD, CONN.**

No. 12617.

Circuit Court of Appeals, Eighth Circuit.

April 4, 1944.

Rehearing Denied May 22, 1944.

John R. Stockham, of St. Louis, Mo. (Ben L. Shifrin, Emil Mayer, Roscoe Anderson, W. R. Gilbert, Taylor, Mayer, Shifrin & Willer, and Anderson, Gilbert, Wolfort, Allen & Bierman, all of St. Louis, Mo., on the brief), for appellant.

Warren M. Humes, of Hartford, Conn., and James C. Jones, Jr., of St. Louis, Mo. (Lon Hocker, Jr., and Jones, Hocker, Gladney & Grand, all of St. Louis, Mo., on the brief), for appellee.

Before STONE, THOMAS, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The action is one by a beneficiary to recover on the accidental death benefit provision of three life insurance policies. The regular death benefit under each policy had been paid. By the provision involved, the insurer had agreed to pay an additional sum equal to the face amount of each policy, if the insured's death resulted "from bodily injury effected solely through * * * accidental means", excluding, however, death "from self-destruction" or "from poisoning".[1]

The insured had died from an overdose of nembutal, known pharmacologically as pentobarbital sodium and ordinarily taken to produce sleep. The insurer contended (1) that the death was not one from accidental means; (2) that it was a death from self-destruction; and (3) that it was a death from poisoning.

The case was tried to a jury, which returned a general verdict for the insurer,

---

[1] The accidental death benefit provision (which was in the form of a rider attached to the policy) was the same in each contract, except as to the amount payable, and was in the following language: "The Connecticut Mutual Life Insurance Company * * * agrees to pay [a stated amount] (in addition to the amount payable under said Policy) upon receipt * * * of due proof * * * that such death resulted, directly and independently of all other causes, from bodily injury effected solely through external, violent and accidental means, of which (except in case of drowning or of internal injuries revealed by an autopsy) there shall be evidence by a visible contusion or wound on the exterior of the body * * *. The Company shall not be liable for any payment hereunder if such death shall directly or indirectly result * * * from self-destruction while sane or insane, * * * from poisoning or infection other than that occurring simultaneously with and in consequence of bodily injury, from bodily or mental infirmity, or from disease of any kind."

but which, by its answers to three special interrogatories submitted at the insurer's request, found (1) that the death was one from accidental means; (2) that it was not a death from self-destruction; but (3) that it was a death from poisoning. The beneficiary has appealed.

The parties agree that all the policies are New York contracts and that the law of New York is controlling in the action. The principal question, therefore, in view of tne answers made to the special interrogatories, is whether the jury was correctly and sufficiently advised, by the instructions generally or in connection with the special interrogatories, of the sense in which it was to apply the term poison or poisoning under New York law, so that it was legally able to decide whether the insured died from poisoning.

Without going into the details of the evidence, the general situation should perhaps be stated. For a year or more before his death, the insured had been using nembutal to induce sleep. His purchases and taking were apparently made without medical prescription or direction. He generally took a 1½-grain capsule, but, if this did not prove effective within 15 or 20 minutes, he would repeat the dose. He was suffering from nervousness and a stomach ailment and had given up his active occupation. On the occasion here involved, he had returned from a wrestling match about 1:00 o'clock A.M., and his wife and he had drunk some beer and visited awhile before they retired. During this period, he went to the bathroom twice, and his wife "heard him rattling in the medicine cabinet". He complained that his stomach was bothering him, and just before his wife fell asleep he again went to the bathroom. The wife did not know how many nembutal capsules he had taken on any of these trips, nor did she hear him when he returned the last time to the bedroom. The next thing she knew was when he awakened her and told her that he was cold. She saw that he was ill and called a doctor, but before medical aid arrived he had died.

The autopsy showed that death was due to an overdose of nembutal. The stomach contained a quantity equal to 15 of the sleeping capsules, in addition to that which had been absorbed into his system and caused his death. There was testimony by medical experts for the insurer that from 10 to 30 grains of nembutal ordinarily would have a fatal effect, although it was admitted that the amount would vary with the susceptibility of the individual and with the tolerance which habitual use might develop, and that there had been clinical cases where 75 to 105 grains were known to have been taken and the victim had survived, on antidotal treatment. The medical witnesses further declared that nembutal was a poison, but their concept was a purely scientific one, for they regarded anything which had produced a lethal toxic effect as being poisonous in the particular situation. One witness testified that whiskey and alcohol might thus be classified as poisons.

But scientific concept or definition would not necessarily be determinative of whether nembutal was a poison within the meaning of the exclusion clause of the policies. The New York courts have held that, in determining the meaning of the terms of an insurance contract, the point of view "must not be that of the scientist", but "that of the average man" (Lewis v. Ocean Accident & Guarantee Corp., 224 N.Y. 18, 120 N.E. 56, 57, 7 A.L.R. 1129); that the contract must "be interpreted in the light of the language which we commonly use and understand; in other words, our common speech" (Mansbacher v. Prudential Insurance Co., 273 N.Y. 140, 7 N.E.2d 18, 20, 111 A.L.R. 618); and that a term in a policy should accordingly be given such a meaning "as common thought and common speech would now image and describe it" (Van Vechten v. American Eagle Fire Ins. Co., 239 N.Y. 303, 146 N. E. 432, 433, 38 A.L.R. 1115). As a matter of legal principle, therefore, the jury was required to determine, not whether the insured's death from nembutal was a death from poisoning by scientific concept and definition, but whether on the facts and circumstances, viewed in the light of common knowledge and experience, his death was one from poisoning within the understanding and use of that term by the average man.

We have pointed out in Aubuchon v. Metropolitan Life Ins. Co., 142 F.2d 20, this date decided, that certain substances, such as arsenic, strychnine, and carbolic acid, are perhaps so universally regarded as poisons in the public mind that they may be declared to be such, within the meaning of an insurance exclusion clause, as a matter of law; that as

to other substances there may not be such public familiarity as to have created any general concept whatever, and that the question in such a case ordinarily will be one for appraisal by the jury on the evidence produced; and that as to still other substances some general concept may exist but can not be said to be legally clear, or it may possibly be subject to some variation with the conditions and hence not absolute, and that here also whether the substance involved constitutes a poison will have to be determined on the facts and circumstances of the particular case, but with the right to apply to the evidence such common knowledge and experience as may exist with respect to the substance. As to any substance which requires jury appraisal, scientific concept may perhaps be of some evaluating assistance, but ultimate resolution of the question will depend upon the determination of what reasonably would be the general public concept in the situation.

In the present case, the trial court's instructions nowhere told the jury on what basis it should determine whether the insured's death from nembutal was a death from poison. The jury was merely instructed that its verdict should be for the insurer, if it believed from the evidence that the insured's death was the result of poisoning. In submitting the special interrogatory "Was the insured's death the result of poisoning?" the court similarly made no explanation of what concept or standard the jury was required to employ in attempting to answer the question.

■■■ A mere instruction omission, without a specific request,[2] would of course not ordinarily prompt us to reverse a judgment, but the situation here is one in which we are convinced that the jury was confused and not competently able to determine the proper principle to be applied, and where the implied concept of the instruction had at least been attempted to be challenged. The exclusive emphasis of

the scientific concept in the evidence, with no indication of the right to be guided by any general public concept, seems to us, in the particular circumstances of the case, to have made the bare instruction, that the jury was to determine from the evidence whether the insured's death was the result of poisoning, imply to the jury's mind that the question whether nembutal was a poison was to be resolved solely on the basis of the testimony of these witnesses. The proceedings which thereafter occurred in connection with the jury's deliberation tend to confirm the jury confusion.

The record shows that, after the jury had deliberated for several hours, it reported that it was unable to agree. The trial judge urged it to continue its deliberation, and the foreman then asked to have the instructions re-read. The court, instead, summarized the situation and as to the poisoning issue stated: "There is another defense in the case—that if the death resulted from poisoning, accidentally or unaccidentally administered, if the death resulted from poisoning, there could be no recovery in the case. *Go over it again.* Did the death result from poisoning? No recovery, whether accidentally or unaccidentally administered." [3] (Emphasis added.) In approximately an hour, the jury returned to the court room with a finding that the insured's death was one from poisoning.

From all of this and from the proceedings generally, we have been unable to escape the conviction that the jury was led to believe that the view of the medical experts was controlling upon it. The record seems to us to indicate that the trial judge himself regarded the scientific concept as the governing legal standard. He seemingly did not believe that there should be any limitation or clarification made of the implied concept of the instruction, even after the beneficiary had purported to attack its apparent scope. Under all the circumstances of the particular situation, but

---

2 While the beneficiary did not make a request for a more specific instruction, she did attempt, by exception to the instructions, to challenge the scientific concept of poisoning, to the extent of pointing out that the evidence showed that nembutal in normal doses was not harmful to the body and of contending that medicine, even if taken in excessive amounts, could not be regarded as a poison. She argued that

the court ought to hold that there was no poisoning involved, as a matter of law.

3 The beneficiary renewed her previous exception to the court's instructions, to the extent of pointing out that, even though the taking of an excessive amount of medicine might be construed as a poisoning, it would not constitute a death from poisoning within the meaning of the policy exception.

without commitment to an absolute principle in other cases, we think the judgment should be reversed and a new trial granted.

In its attempt to sustain the judgment, the insurer has argued that the trial court should have declared nembutal to be a poison as a matter of law, and that no prejudicial error therefore could possibly have been committed. This contention rests upon the suggestion of the New York Court of Appeals in Mansbacher v. Prudential Insurance Co., 273 N.Y. 140, 7 N.E.2d 18, 21, 111 A.L.R. 618, and of the Appellate Division in the same case, 247 App.Div. 378, 287 N.Y.S. 486, 489, that morphine constitutes a poison within the meaning of an insurance exclusion clause. The Mansbacher case, however, did not involve an issue of poisoning, but merely one of accidental means. The expressions as to morphine were made to avoid the effect of the implied holding on accidental means in the previous case of Pixley v. Commercial Travelers' Mutual Accident Ass'n, 165 App.Div. 950, 150 N.Y.S. 1107, affirmed 221 N.Y. 545, 116 N.E. 1070.

In the Pixley case, the insured had taken an overdose of morphine while suffering neuralgic pain. The insurer moved for a nonsuit on the ground that the death was not one "through external, violent, and accidental means" within the policy coverage, and also that it was a "death resulting from or caused * * * by poison, taken voluntarily, involuntarily, or accidentally" within the meaning of the exclusion clause. The trial judge granted the nonsuit on the sole ground that the evidence would not sustain a finding that the death was one from accidental means, because, as he viewed it, the death was as consistent with the theory that the insured "made a mistake in his judgment as to the effect upon his system the tablets would produce" as with the theory that "he accidentally poured the tablets out". The Appellate Division and the Court of Appeals affirmed the judgment without any statement of their reasons.[4] The effect of the trial court's decision in the Pixley case, as construed in Fane v. National Ass'n Railway Mail Clerks, 197 App.Div. 145, 188 N.Y.S. 222, 225, was that, since the insured intended to take the morphine, "the means were not accidental, but deliberate and intentional, and that only the result was accidental and therefore not covered by the policy."

In the Mansbacher case, the insured had taken an overdose of veronal to relieve an earache. The Supreme Court, Appellate Term, in 154 Misc. 796, 278 N.Y.S. 225, 226, adopted the same view as that of the trial judge in the Pixley case and held that "The unforeseen death of the insured resulting from the intentional taking, to relieve an earache, of a dose of veronal which proved fatal, does not come within the meaning of the terms of the policy", as a death resulting from bodily injuries effected solely through external, violent, and accidental means. The Appellate Division reversed this decision on the ground that, while the insured intended the act which resulted in his death, he did not anticipate the unusual result which followed, and that his death therefore occurred through accidental means. In order to escape the implication of the affirmance which it had made in the Pixley case and also that of the Court of Appeals, as an apparent approval of the trial judge's views in that case on accidental means, the court said, 287 N.Y.S. at page 489, that "the affirmance may not be said necessarily to have been predicated upon the reason assigned by the learned trial justice." It then pointed out that the policy in the Pixley case had contained a poison exclusion clause and added: "It is thus apparent that, even had the trial justice regarded the death as having resulted through accidental means—contrary to his expressed reason for the dismissal of the complaint—such disposition would have been proper. Death, through accidental means, would not have entitled the plaintiff to recover where the accidental means was the taking of poison voluntarily, involuntarily, or accidentally."

In affirming the decision of the Appellate Division, the Court of Appeals, in 273 N.Y. 140, 146, 7 N.E.2d 18, 21, 111 A.L.R. 618, similarly attempted to escape the effect of the Pixley case, by declaring: "The Pixley case was an entirely different case as the conditions specifically stated that the policy should not extend to nor cover injuries of which there should be no external, visible mark on the body of the insured, nor to injuries or death resulting from or caused by a poison taken volun-

---

[4] In order to assist us in fully understanding the situation in the Pixley case, the insurer has commendably furnished us with a photostatic copy of the New York Court of Appeals record.

tarily, involuntarily, or accidentally. The insured there died from the effects · of a dose of morphine from which there was no external, visible mark on the body, and, further, it was a poison which even if taken accidentally, did not bring the case within the terms of the policy."

■ Giving due weight and effect to these expressions of the New York courts, as we must—even though their immediate purpose was obviously escapive—they do not seem to us to require or warrant an absolute declaration that nembutal is a poison as a matter of law. The basis for the absolute concept that morphine is a poison has not been indicated by the New York courts, although it may be observed in passing that the legislature of the State has apparently similarly classified it, by requiring that it be sold with a "poison" label, the same as arsenic, strychnine and potassium cyanide. See Cahill's Consolidated Laws of New York 1930, ch. 15, §§ 1360, 1364; McKinney's Consolidated Laws of New York Annotated, c. 16, Education Law, §§ 1366, 1370-d. But whatever may be the general public concept of morphine as an absolute poison in the State of New York, because of its particular public health laws or for other reasons unknown to us, we do not feel that this single fact either enables or entitles us to declare that ordinary barbiturates necessarily occupy a similar or equally absolute position in the public mind. Without any such express declaration by the New York courts, it is our view that the common-thought-and-speech concept applied generally by the New York courts to insurance policy terms requires us to hold that the question whether the insured's death from nembutal in the present case was a death from poisoning was a matter for appraisal by the jury.

There similarly is no merit in the antithetical contention of the beneficiary that nembutal should be declared not to constitute a poison in this case as a matter of law. The cases of Dezell v. Fidelity & Casualty Co., 176 Mo. 253, 75 S.W. 1102, and Equitable Life Assur. Soc. v. Hemenover, 100 Colo. 231, 67 P.2d 80, 110 A.L.R. 1270, cited in support of the beneficiary's contention, have been considered and discussed by us in Aubuchon v. Metropolitan Life Ins. Co., 142 F.2d 20, this date decided. We there indicated that we did not believe that the declaration in the Dezell case, that a substance taken in good faith, for medicinal purposes, and on medical prescription, does not constitute a poison in popular concept, within the meaning of an insurance exclusion clause, was intended by the Missouri Supreme Court as a legal absolution for all self-selected nostrums that an insured might see fit to take even for intended medicinal purposes. Whether such a self-selected substance was one which in popular concept the insured was justified in not treating as a poison and in taking for medicinal purposes necessarily could and perhaps ordinarily would be a question for the jury. But, in any event where, as here, the purpose for which the insured had taken the substance was factually disputed, the issue manifestly was not one that could be wholly removed from the jury's consideration.

■ The insurer, in a further attempt to sustain the judgment, has argued that the evidence was in any event insufficient to support a finding that the death was one from accidental means. In testing the sufficiency of the beneficiary's evidence on accidental means, we need not, of course, concern ourselves with the circumstantial evidence of the insurer to support an inference of suicide. The general facts which have been set out above, plus the evidence on behalf of the beneficiary that, where a dose of nembutal did not immediately produce a soporific effect, it was recognized medically that it could produce a state of automatism, in which the user might take another dose without being conscious of what he was doing, must be held to be sufficient to present a jury question on accidental means, within the rule applied by the New York courts in Mansbacher v. Prudential Insurance Co., 273 N.Y. 140, 7 N.E.2d 18, 111 A.L.R. 618, and 247 App.Div. 378, 287 N.Y.S. 486.

■ The beneficiary seeks to have us declare that the trial court erred in admitting certain hospital records of the insured, on the ground that they were privileged under Missouri law. The theory of the insurer was that the statements which the hospital records showed that the insured had made as to previous attempts to commit suicide were not privileged under Griffith v. Continental Casualty Co., 299 Mo. 426, 442, 253 S.W. 1043, 1047. After these statements had been received over the beneficiary's objection, the beneficiary herself undertook to offer and read other parts of the hospital record which she regarded as favorable to her cause. The insurer then in turn offered the entire

record, on the ground that all privilege had thereby been waived. Whether the part of the record first offered by the insurer was originally privileged, we need not consider, for the beneficiary clearly waived any privilege that might have existed as to the record generally, by her subsequent offering of portions thereof in evidence. Cf. 8 Wigmore on Evidence, Third Edition, §§ 2388, 2390; Jennings v. National Life & Acc. Ins. Co., 226 Mo. App. 777, 46 S.W.2d 226; Wells v. City of Jefferson, 345 Mo. 239, 132 S.W.2d 1006; Demonbrun v. McHaffie, 348 Mo. 1120, 156 S.W.2d 923; Bouligny v. Metropolitan Life Ins. Co., Mo.App., 160 S.W.2d 474.

For the reasons which have been stated, the judgment is reversed and the cause is remanded for a new trial.

### On Petition for Rehearing.

On petition for rehearing the insurer argues that our opinion has ignored the rule that a mere omission to charge is not ground for reversal in the absence of a request for a specific instruction.

As the opinion suggests, the situation seemed to us to be a bit beyond the scope and purpose of this rule. The proceedings indicated that the jury was confused and legally unable to determine the poisoning issue from the court's instructions. The exclusive emphasis in the evidence upon the scientific concept of poisoning had tended to make the bare instruction that the jury was to determine from the evidence whether the insured died from poisoning imply that the question was to be resolved on the basis of scientific concept. The beneficiary, while not tendering or requesting a specific instruction, had, by her exceptions to the charge, challenged the unqualified concept of the instruction. And finally, the court's failure to limit or qualify this implication, after the challenge, suggested that any request for an instruction on popular concept or standard would have been futile.

But if these views seem too liberal an absolution of the beneficiary's failure to request a specific instruction, as the insurer argues, there is another element in the situation that still would require our reversal to stand. The poisoning question here was compositely one of law and fact.

It could be made one of mere fact only by the court's elimination of its legal aspect through a controlling instruction. This not having been done, the interrogatory "Was the insured's death the result of poisoning?" submitted to the jury, under the circumstances of the case, a question of law and fact for specific answer. Rule 49 (b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, authorizes the submission only of pure fact questions by way of special interrogatories. Cf. Carpenter v. Baltimore & O. R. Co., 6 Cir., 109 F.2d 375. The Rule further requires that the court shall give "such explanation or instruction" as may be necessary to enable the jury competently to answer the interrogatories submitted. That certainly cannot be claimed to have been done here, for, as suggested above, if the jury was to be able to answer the poisoning interrogatory as a fact question alone, it was necessary that the court first eliminate its inherent legal aspect by some sufficient explanation or instruction, either in the general charge or in connection with the special interrogatory.

The beneficiary objected to the submission of the special interrogatory and has assigned the giving of it as error.

We do not imply, of course, that the submission of any improper interrogatory necessarily is reversible error—any more than we have previously implied in the opinion that a party can escape the effect generally of his failure to request a specific instruction in relation to a general verdict. But the submission of an improper special interrogatory, or the submission of a special interrogatory without such explanation or instruction as will enable the jury competently to answer it, manifestly may constitute reversible error where the record is convincing that the answer made to the special interrogatory has determined the result of the jury's general verdict. That clearly is the situation here, for, by the answers which the jury made to the other special interrogatories submitted, it settled every other question in the case in favor of the beneficiary.

On the entire situation, we think a retrial is properly and justly required. The petition for rehearing is accordingly denied.