774 F.2d 1163
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Elmer Rodgers; Ronald D'Alessandro, d/b/a D'Alessandro,
Inc.; Marcus O'Hara, Sr., Marcus O'Hara, Jr.; Richard
Keller, d/b/a O.K.O. Corp.; Robert Dauwe;Jack Walkenhorst;
Harry Walkenhorst, d/b/a CFM 2916, Inc.; Jack Walkenhorst;
Harry Walkenhorst; Edward Yoho, d/b/a Yoho 2918, Inc; Thomas
R. Smith, d/b/a Smith's Convenient, Inc.; Guy Gibson, d/b/a
CFM 2909, Inc.; Thomas Feldmann, Kristen Benner, d/b/a CFM
2933, Inc.; Thomas Feldmann; Robert M. Fenwick,
Plaintiffs-Appellants, Cross-Appellees,
v.
Ohio Valley CFM, Inc., Defendant-Appellee, Cross-Appellant,
Convenient Food Mart, Inc., et al., Defendants-Appellees,
Lynch Enterprises, Inc., et al., Defendants-Intervenors-Appellees.
 
 Nos. 84-3533, 84-3578
 United States Court of Appeals, Sixth Circuit.
 9/13/85
 S.D.Ohio
 REVERSED AND REMANDED
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO
 BEFORE: MARTIN and KRUPANSKY, Circuit Judges; and PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This case involves an appeal and cross-appeal from judgments entered following a jury verdict in this dispute between thirteen owner-operators of Convenient Food Mart franchises in the Cincinnati area, and their franchisor, Ohio Valley CFM, Inc. (OVCFM). OVCFM is a regional franchisor licensed by Convenient Food Mart, Inc., the national franchisor.
 
 
 2
 The franchisees had been licensed by OVCFM, for periods ranging from eight to fifteen years, to own and operate grocery retail outlets in the Cincinati area. OVCFM required all of the plaintiffs to execute four documents at the time they became franchisees, including an exclusive franchise agreement, an accounting agreement, a declaration of franchise policy and disclosures, and a sublease of the premises from OVCFM.
 
 
 3
 Basically, the exclusive franchise agreement granted franchisees the right to operate a Convenient Food Mart provided the franchisee possessed a valid lease or sublease to or owned the described premises and fully performed various covenants. The franchisee correspondingly agreed to remit one percent of gross sales less sales tax to OVCFM. Another two percent of gross sales was directed into a fund to defray costs of services rendered by OVCFM to franchisee. A final one percent constituted a fund to be allocated for advertising as provided in the agreement. OVCFM agreed to furnish in reasonable quantities point-of-sale advertising material and conduct general franchise advertising through all media. OVCFM retained the option to discontinue all rights under the agreement upon franchisee's default or loss of lease. The contract recited that it represented the entire agreement between the parties and disclaimed any extrinsic representations or promises between the parties not contained therein. Finally, the franchise agreement established Ohio law as governing and reserved to OVCFM the right to determine all questions of policy as to promotion, advertising, distribution, use, merchandising, and sales not specifically covered by the contract.
 
 
 4
 The accounting agreement required that the franchisee deposit all receipts in a bank account to which OVCFM would have exclusive access. The declaration of policy justified the leasing arrangement, whereby OVCFM as prime lessor subleased to franchisee at 'a slightly greater rate' than that paid by OVCFM to the landlord, as compensation for OVCFM's services in negotiating a presumably favorable prime lease and assuming responsibility for monthly rental payments. When it entered into the initial franchise agreements with plaintiffs, OVCFM's contract with the national franchisor, Convenient Food Mart, Inc., required OVCFM to sublease store premises to its franchisees and to charge franchisees $50.00 over the prime lease rental.
 
 
 5
 The initial franchise agreement executed by each plaintiff had no expiration date, but rather was to continue as long as the franchisee did not violate the franchise agreement and as long as a lease of the subject premises could be maintained. OVCFM insisted that each franchisee sublease the premises from OVCFM, even in those instances where the franchisee had managed to negotiate a lease directly with the property franchisee (plaintiff Rodgers) and even when the franchisee owned the property (plaintiff Fenwick). When the plaintiffs' respective lease terms expired, OVCFM intentionally did not renew the subleases, but permitted them to lapse. Plaintiffs' rights under the franchise agreements therefore automatically terminated and OVCFM would then compel the franchisees to purchase new franchise agreements, despite the fact that plaintiffs had otherwise complied with the initial agreements.
 
 
 6
 Each of the franchisee plaintiffs encountered a similar experience. OVCFM intentionally permitted the franchisee's sublease to expire and then, unilaterally and without consent, set new rents and deducted that amount from the account of the franchisee. The franchisee 'lost' his initial franchise and, to remain in business, was compelled to purchase a new less favorable franchise agreement.
 
 
 7
 Plaintiffs commenced this lawsuit in November 1982, alleging several state and federal antitrust violations, as well as violations of state law and breaches of fiduciary duty by OVCFM with respect to the subleases and 'new' franchises. Eventually, pursuant to partial summary judgment and court order, the plaintiffs amended the complaint and proceeded to a jury trial on a federal price-fixing claim under Sec. 1 of the Sherman Act, 15 U.S.C. Sec. 1, and on charges of breach of contract, breach of fiduciary duty, and fraud. The trial court permitted a group of franchisees of OVCFM other than plaintiffs to intervene as party-defendants approximately nine months after commencement of this action to support OVCFM's position.
 
 
 8
 At trial, the jury received testimony from various franchisees concerning their dealings with OVCFM in negotiating their respective franchises. The thrust of plaintiffs' testimony disclosed that OVCFM's representative, usually OVCFM's president John Hancock, vice-president Ralph Boeckman, or secretary-treasurer David Schweitzer, emphasized to the particular prospective franchisee the 'family' nature of the franchise relationship and the parties' mutual interdependence. OVCFM insisted that the prospective franchisee lease or sublease the premises from it. OVCFM assured the prospective franchisee that OVCFM would negotiate a favorable prime lease for him and pass the benefits of the prime lease on to him. The prospective franchisee and OVCFM orally agreed to a sublease for a certain term with an option to renew (usually more than once) for a specified time period if the prospective franchisee became a good operator. The written sublease failed to reflect the renewal options. If questioned about this discrepancy, OVCFM nevertheless assured the prospective franchisee of the existence of the options. OVCFM also represented that the surcharge on the sublease as related to the monthly rental on the prime lease was limited to the slightly greater rate of $50.00 per month. Relying on these assurances, the particular prospective franchisee entered into the sublease and franchise agreement.
 
 
 9
 OVCFM exercised complete control over the franchisee's bank account and receipts, deducting four percent of gross sales and rental payments. As previously stated, OVCFM intentionally permitted either the sublease or prime lease to expire without renewal, forcing the franchisee to accept a new sublease and a new franchise agreement. Upon expiration of existing leases, OVCFM unilaterally deducted higher rental payments from the particular franchisee's account even before a new lease or sublease was executed. Furthermore, the rental payments under the newly executed leases included a surchange over the prime lease rental amount substantially in excess of the original $50.00 increment. The new franchise agreement was also comparatively less favorable to the franchisee. For example, the new contract generally omitted the previous requirement that OVCFM use one percent of gross sales for an advertising fund. If the franchisee refused to accept the less favorable modifications, OVCFM would refuse to execute a new franchise agreement.
 
 
 10
 OVCFM offered testimony that it increased the rent surcharges not as a result of increased administrative costs or corporate risks, but because of a dramatic appreciation in the market value of the leases. OVCFM's contract with the national franchisor was modified in May 1982 at OVCFM's request to delete the requirement that OVCFM charge franchisees a rent of $50.00 above the prime lease rent. One witness conceded that OVCFM, as part of the agreement, told prospective franchisees that it would continue to provide good operators with subleases incorporating all the benefits of the prime lease. Another witness insisted that OVCFM made no promises to renew leases, and that OVCFM contemplated new leases and franchise agreements upon expiration of the initial lease. OVCFM withdrew increased rentals from franchisee bank accounts pursuant to the accounting agreement.
 
 
 11
 OVCFM had never established individual accounts for the advertising and rebate fund called for by the franchise agreement, but had conducted separate accountings. Although OVCFM had never established a formal budget for advertising, it was aware of such expenditures; it never intended to expend one percent of gross sales on advertising, but expended an amount it viewed as necessary and reasonable. From 1970 through 1982, OVCFM collected $795,715 more in franchisee advertising fees than it expended on direct advertising.
 
 
 12
 After this lawsuit was initiated, in response to discovery demands, OVCFM retroactively allocated certain expenses to the franchisee advertising fund. OVCFM included in this allocation all of its charitable contributions, fifty percent of its corporate country club dues, twenty-five percent of its corporate automobile expenses, fifty percent of its magazine subscriptions, and salaries of advertising personnel. OVCFM never disclosed to franchisees that it was charging to the advertising fund overhead, operating, or any other expenses besides direct advertising costs. Both sides offered testimony regarding the appropriateness of such an accounting procedure. Under the retroactive allocation, OVCFM testified that its advertising expenditures exceeded its revenues from the one percent gross sales assessment.
 
 
 13
 The liability aspect of the case was submitted to a jury which found in favor of defendants on the price fixing and fraud claims. On the breach of contract and fiduciary duty claims, the jury responded to the relevant interrogatories in the following manner:
 
 
 14
 (3a) Do you unanimously find that defendant Ohio Valley CFM, Inc. was required by contract to renew the lease of any plaintiff at a monthly rental of $50 more than the prime lease?
 
 NO.
 
 15
 * * *
 
 
 16
 * * *
 
 
 17
 (3b) Do you unanimously find that defendant Ohio Valley CFM, Inc. failed to spend 1% of a plaintiff's gross sales and advertising rebates on advertising?
 
 YES.
 
 18
 If you have answered 'Yes,' note on Verdict Form IIIB those plaintiffs whose contract was so breached.
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 (4a) Do you unanimously find that defendant Ohio Valley CFM, Inc. owed any fiduciary duty to any plaintiff as those terms are described in Instructions 7600, 7601.1 and 7602?
 
 YES.
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 (4b) Do you unanimously find that defendant Ohio Valley CFM breached such duty to any plaintiff?
 
 YES.
 
 25
 Following a trial on damages, the same jury awarded plaintiffs damages for OVCFM's failure to expend advertising funds and for breach of fiduciary duty. No punitive damages were awarded.
 
 
 26
 OVCFM appealed the issues that it lost. The franchisees appealed the trial court's dismissal of certain claims, the jury verdict as to breach of contract for lease renewal, the trial court's denial of equitable relief following judgment, and the trial court's decision to permit the participation of the intervenors.
 
 
 27
 The significant issue on this appeal focuses on the adequacy of one of the interrogatories submitted to the jury on the issue of liability. Plaintiffs charge that the trial court erred by submitting defective jury interrogatories concerning the breach of contract claim related to the lease renewal and by failing to clarify the interrogatory when the jury manifested confusion regarding it. The interrogatory at issue is (3a):
 
 
 28
 (3a) Do you unanimously find that defendant Ohio Valley CFM, Inc. was required by contract to renew the lease of any plaintiff at a monthly rental of $50 more than the prime lease?
 
 
 29
 If you have answered 'Yes', note on Verdict Form III B those plaintiffs whose contract was so breached.
 
 
 30
 After retiring to consider their verdict, the jury presented nine written questions to the trial court which indicated that they were unable to reconcile their verdict to the form of the interrogatories. The jury's question with respect to 3(a) was as follows:
 
 
 31
 In deciding on the breach of contract claim, can we decide issues separately such as [A] advertising claim, [B] whether the slightly greater rate claim was followed, [C] whether there was an oral agreement about renewal, [D] whether there was an oral agreement about prime lease plus fifty; the degree of damage depends upon whether any one of these or all were breached, yet A and D seem to be the only [issues] mentioned in the charge.[1]
 
 
 32
 The trial court informed counsel of its intended response to the jury question and no objection was taken. Accordingly, the jury was told: 'Please examine verdict form 3b, the degree of damages is not before you.'
 
 
 33
 The jury's confusion was not alleviated. It returned the following question (read by the trial judge in chambers conference with the attorneys):
 
 
 34
 THE COURT: Okay. 'Jury question three asks us to decide if Ohio Valley was required to renew the lease at fifty dollars more than the prime lease. We believe that they were required to renew it at a slightly greater rate based on fifty dollars and the amount of the original prime lease. As such, many of the contracts appear breached, but not for an amount of fifty dollars. How do we answer or amend 3-a to reflect this?'
 
 
 35
 The answer I don't want to give them is that if you so find, you are going to have to come back at a later date and decide it. I told you, gentlemen, I've been very careful not to let them know that, if they decide for the plaintiffs, there will be a later hearing on the damages, because I think that can affect them.
 
 
 36
 MR. HELMER [Plaintiffs]: Can I ask you a question about this? As I understand what you just read, they seem to be saying that we think the contracts have been reached, but we think in some cases it's the difference of fifty dollars, and in some cases, it may be more or less than fifty dollars. The jury form does not indicate what amount it is. Is that how you read the question?
 
 
 37
 MR. O'CONNELL [Intervenors]: I think slightly greater.
 
 
 38
 THE COURT: They say this, 'As such, many of the contracts appear breached, but not for an amount of fifty dollars.'
 
 
 39
 MR. HELMER: In other words, an amount different than fifty dollars is the amount of the breach.
 
 
 40
 THE COURT: I see where you are going. The amount of the breach is not before them.
 
 
 41
 Yes, sir, which I think is what you were saying.
 
 
 42
 MR. HELMER: I guess what I'm saying is you, obviously, cannot tell them about coming back.
 
 
 43
 THE COURT: I'm not going to. I think I can tell them that the question presented to them was whether or not the contract was breached. Period. That they need not concern themselves beyond that point.
 
 
 44
 MR. HELMER: I think that's correct.
 
 
 45
 MR. GLICKMAN [OVCFM]: There is that question 3-a, our question 3-a, the one you drafted, which is what I though . . . is what the evidence in this case showed. Either we had a duty to renew at fifty dollars, or, we had a duty or we didn't.
 
 
 46
 THE COURT: That's correct.
 
 
 47
 MR. GLICKMAN: If they were saying that there was some third duty, then we have real problems ----
 
 
 48
 THE COURT: No, I don't know that. As a matter of fact, it may be that your duty, your stated duty was to renew at a slightly greater, and that you established that as fifty dollars. But that seems to me to be a slightly different question.
 
 
 49
 We got into this some, but I think you are entitled to get into it even more. Assume for a moment that they find you were obligated to renew at a slightly greater rate. Isn't it then a question of damages as to what that rate should have been? For an example, . . . [i]f in 1972, the slightly greater rate was fifty dollars, its entirely reasonable that the slightly greater rate today is hundred or hundred and twenty-five dollars, based on the consumer price index, if nothing else.
 
 
 50
 What I'm trying to suggest is that you have a duty in concept and you have a dollar figure for not doing that, but I don't think that it is for them to decide anything other than whether thwere was a breach. The fifty dollars I really don't think has any significance at this point.
 
 
 51
 * * *
 
 
 52
 * * *
 
 
 53
 I'm inclined to reply to them that 3-a is self-explanatory, that they answer that question. They were either required to renew or they were't.
 
 
 54
 * * *
 
 
 55
 * * *
 
 
 56
 My inclination, gentlemen, is to tell them that question 3-a is a specific and direct question and they are to answer this question, period.
 
 
 57
 * * *
 
 
 58
 * * *
 
 
 59
 Question 3-a asks a specific question as to each--you know what, I'm inclined to let it go right there. 'Question 3-a asks a specific question as to each plaintiff.'
 
 
 60
 * * *
 
 
 61
 * * *
 
 
 62
 Anything I add to it is going to be either persuasive or coercive. I'm not willing to do either. I'm simply going to respond, question 3-a asks a specific question as to each plaintiff.
 
 
 63
 Ms. Ruppin, if you will include that in the list of questions, I will send this question up.
 
 
 64
 (Conference concluded). No objection was made to the trial judge's proposed response. The jury then answered 'no' to interrogatory (3-a) and 'no' as to each plaintiff on the breach of contract-lease renewal issue on Verdict Form IIIB.
 
 
 65
 Plaintiffs contend that the primary source of the jury's confusion was the inclusion of the damage element in the liability question. The jury's communications, plaintiffs observe, clearly reflected its belief that there was a contractual obligation to renew which was breached, which was the issue before it. However, (3-a) sought to determine if there was a contractual obligation to renew at fifty dollars, which the jury recognized as two distinct questions, one of which was not before it. In its first question to the court, the jury clearly separated the liability and damage element for the court by dividing the breach of contract claim into, inter alia, 'whether there was an oral agreement about renewal' and 'whether there was an oral agreement about prime lease plus fifty.' The jury indicated that contracts to renew had been breached but not contracts to renew at 'prime lease plus fifty.' Because the trial court insisted that the jury answer (3-a) as it stood, plaintiffs argue that the court in effect directed a 'no' response to interrogatory (3-a) based on an issue irrelevant to liability, namely the amount of damages.
 
 
 66
 The jury's confusion was justifiable, in light of testimony at trial that OVCFM would renew the subleases if plaintiffs were good operators and testimony concerning the ambiguous phrase 'slightly greater rate.' Plaintiffs had thereby articulated to the jury a theory of two complementary but distinct contracts: one to renew the subleases of good operators, and another to renew the subleases on certain rental terms. The jury indicated to the trial judge that it had decided that the first claim was valid, but was unsure about the second. Question (3-a) merged and confused those concepts.
 
 
 67
 An interrogatory may be defective and warrant retrial if it combined and confused two theories of liability and might have thereby 'prevented the jury from fully and properly considering either.' Gootee v. Colt Industries, Inc., 712 F.2d 1057, 1067-68 (6th Cir. 1983). In such circumstances, the jury is foreclosed from ruling in favor of plaintiff unless if concludes in plaintiff's favor on both theories. Where a confusing interrogatory's 'exclusive use effectively directed a verdict in the defendant's favor,' id. at 1066, a new trial is warranted. See also In re Corrugated Container Antitrust Litigation, ---- F.2d ----, ----, Nos. 83-2281, 83-2486 (5th Cir. Apr. 4, 1985) (trial court must 'separate fact of damage from amount of damage' in both 'the instructions and the verdict form'); Worsham v. A. H. Robins Co., 734 F.2d 676, 690 (11th Cir. 1984) ('interrogatories must pose the question presented by the case accurately'); Cutlass Productions, Inc. v. Bregman, 682 F.2d 323, 327 (2d Cir. 1982) (interrogatories must 'clearly present the material fact issue raised by the pleadings and evidence') (citations and footnote omitted, emphasis in original); Petes v. Payes, 664 F.2d 523, 525 (5th Cir. 1981) ('interrogatories must pose the questions accurately and be stated in a manner that avoids the potential for confusing or misleading the jury'). in Feldmann v. Connecticut Mutual Life Ins. Co., 142 F.2d 628 (8th Cir. 1944), upon which plaintiffs in this case rely, the Eighth Circuit explained:
 
 
 68
 A mere instruction omission . . . would of course not ordinarily prompt us to reverse a judgment, but the situation here is one in which we are convinced that the jury was confused and not competently able to determine the proper principle to be applied, and where the implied concept of the instruction had at least been attempted to be challenged. . . . The procedings which thereafter occurred in connection with the jury's deliberation tend to confirm the jury confusion.
 
 
 69
 * * *
 
 
 70
 * * *
 
 
 71
 We do not imply, of course, that the submission of any improper interrogatory necessarily is reversible error. . . . But the submission of an improper special interrogatory, or the submission of a special interrogatory without such explanation or instruction as will enable the jury competently to answer it, manifestly may constitute reversible error where the record is convincing that the answer made to the special interrogatory has determined the result of the jury's general verdict.
 
 
 72
 Id. at 631, 634.
 
 
 73
 Such circumstances existed in the present case. The interrogatory was defective by combining and confusing the issues of liability and damages. Because the damage issues had not been tried, the jury was unable to answer affirmatively the compound question. The trial court's refusal to clarify the question effectively directed a verdict in favor of OVCFM.
 
 
 74
 OVCFM argues that plaintiffs waived any objection as to jury confusion because they submitted a similar interrogatory for the judge's consideration. This position is not persuasive. The defect was not evident until the jury manifested its confusion by its inquires to the trial judge. See Worsham v. A. H. Robins Co., 734 F.2d at 689-90. In any event, when the trial judge initially posed his intended interrogatories, plaintiffs did object and requested that the interrogatories spell out and separate the various breach of contract 'theories.' The trial court refused to do so. The failure of the interrogatories to separate distinct factual issues was the source of the apparent confusion.[2]
 
 
 75
 If the trial court's responses to the jury questions are properly characterized as instructions, Rule 51 governs the timeliness of objections thereto. Cf. Levine v. CMP Publications, 753 F.2d 1341, 1344 (5th Cir. 1985) (on denial of rehearing).[3] Plaintiff respond that, by initially requesting that the court below submit carefully delineated interrogatories to the jury, the fundamental error in the instruction had been exposed, thereby satisfying Rule 51, and, under Katch v. Speidel, 746 F.2d 1136 (6th Cir. 1984), they were not required to make subsequent objections on the same point.
 
 
 76
 Although Katch did not consider whether an objection once made need be reaffirmed when the issue arises on subsequent occasions, Katch did broaden the concept of an adequate objection for the purposes of Rule 51. Under Katch, a party need only direct the court's attention to the issue. Once a party 'raises an important issue of law involved in light of proof adduced in the case, it becomes the duty of the trial court to frame a proper instruction on the issue raised, and the court's instruction may then be considered on appeal' even if the party's version of the instruction was itself imperfect. Katch v. Speidel, 746 F.2d at 1139 (citing Celancese Corp. of America v. Vandalia Warehouse Corp., 424 F.2d 1176 (7th Cir. 1970); Meser v. L. B. Foster Co., 254 F.2d 412, 414 (5th Cir. 1958); Westchester Fire Ins. Co. v. Hanely, 284 F.2d 409, 418 (6th Cir. 1960)). In light of Katch's principles, appeal as of right of a confusing interrogatory is preserved once a party notifies the court that an important issue of fact is obviated, overlooked, or confused in the proposed interrogatory. It thereupon becomes the court's duty to frame the interrogatory properly and to submit it to the jury where the fact issue has been joined and is necessary to a proper result. The court's instruction may then be considered on appeal. Cf. Jones v. Miles, 656 F.2d 103, 107 n.6 (5th Cir. 1981) ('[t]he judge generally has a duty to frame a requested instruction properly'), quoted in Katch v. Speidel, 746 F.2d 1136. In the case at bar, as in Katch, plaintiffs directed the court's attention to the potential confusion that could result from a failure to separate the breach claims, and the jury evidenced precisely the same confusion, and an emendment was necessary to properly resolve the fact issues tried by the parties.
 
 
 77
 Plaintiffs urge, in the alternative, that even if their objection to interrogatory (3-a) and to the trial court's answer to the jury's questions was not made either timely or specifically enough to satisfy the rule, that this court could nevertheless consider the matter under the obvious error principle articulated in United States v.Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936), and recently applied by this circuit in Rodgers v. Fisher Body Division, General Motors Corp., 739 F.2d 1102, 1106 (6th Cir. 1984), cert. denied, ---- U.S. ----, 105 S.Ct. 1759 (1985). The rule of obvious error, derived from United States v. Atkinson, is as follows:
 
 
 78
 The verdict of the jury will not ordinarily be set aside for error not brought to the attention of the trial court . . .. In exceptional circumstances, . . . appellate courts, . . . may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.
 
 
 79
 297 U.S. at 159-60, 56 S.Ct. at 392 (citations omitted).
 
 
 80
 The confusion issue alone would not appear to qualify as an exception to the waiver principle of Rule 51. However, combined with the fact that the defendant's president and key operative conceded the matter, that plaintiffs did request a separation of the breach of contract claims, that the jury actually wrote to the court that they had found--contrary to their ultimate verdict--that 'many of the contracts appear breached,' that the interrogatory combined and confused (at least) two distinct issues, and that the trial judge failed to correct the problem after the jury twice informed him of its dilemma, this case seems appropriate for application of the Atkinson and Rodgers v. Fisher Body decisions.
 
 
 81
 Pursuant to the preceding conclusions, application of the principles articulated in TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 546 (6th Cir. 1981), and Bruner v. Dunaway, 684 F.2d 422, 425 (6th Cir. 1982) (per curiam), requires remand for retrial of the breach of contract claims.
 
 
 82
 The parties raise a number of other issues on appeal as well. Plaintiffs assign as error the trial court's denial of their motion for a new trial, which motion challenged the jury verdict for defendants on the state law breach of contract claim for OVCFM's failure to renew the subleases as against the manifest weight of the evidence. In view of this court's remand on the jury instruction issue for partial retrial on the breach of contract claims, this issue need not be addressed.
 
 
 83
 Defendants challenge the jury verdict that OVCFM breached a fiduciary relationship with plaintiffs charging that as a matter of law no fiduciary relationship could have existed. OVCFM does not, however, cross-appeal the jury's factual finding that a duty did exist and that OVCFM violated that duty. This panel rejects OVCFM's contention that under Ohio law a franchisor-franchisee relationship may never give rise to fiduciary obligations, despite defendant's invocation of Stanley Steemer Int'l, Inc. v. Frazier, No. 82-CA-21 (Ohio App. March 15, 1984). The proper focus for the trier of fact in deciding whether a fiduciary relationship existed is whether the context of the parties' dealings evidenced that both parties understood that a special trust or confidence was created. See Stone v. Davis, 66 Ohio St. 2d 74, 419 N.E.2d 1094 (1981); Umbaugh Pole Bldg. Co. v. Scott, 58 Ohio St. 2d 282, 390 N.E.2d 320 (1979). The existence of a fiduciary relationship is a question of fact for the jury. See In re Termination of Employment, 40 Ohio St. 2d 107, 321 N.E.2d 603, 609 (1979); Indermill v. United Savings, 5 Ohio App. 3d 243, 451 N.E.2d 538, 541 (1982) (Bell, J.). Plaintiffs' fiduciary duty claim arose not from the contract but from the extra-contractual statements made by OVCFM's officers. Inasmuch as there was ample evidence in the case at bar from which the jury could conclude that OVCFM had encouraged plaintiffs to believe that it acted in the best interests of plaintiffs as a fiduciary, this court affirms as to this issue.
 
 
 84
 Plaintiffs appeal the trial judge's denial of plaintiffs' motion for equitable relief for defendant OVCFM's breach of fiduciary duty, which was sought by plaintiffs following the jury verdict and damage award. Plaintiffs assert in this court a claim to a constructive trust encompassing the leasehold interests that OVCFM was required by virtue of its fiduciary responsibility to pass on to them. Since the entry of judgment, OVCFM has sought, in various state courts, judgments in forcible entry and detainer actions to dispossess plaintiffs of their stores. It is true that equitable relief such as a constructive trust may be proper under Ohio law where a violation of a fiduciary obligation or use of a confidential relationship enabled the actor to obtain or hold the property interests in dispute. See, e.g., Ferguson v. Owens, 9 Ohio St.3d 223, 459 N.E.2d 1293, 1295-96 (1984); Croston v. Croston, 18 Ohio App.2d 159, 247 N.E.2d 765, 767-68 (1969). Nonetheless, in the instant case, the trial court's denial of plaintiffs' motion was not an abuse of that court's discretion to pass on the appropriateness of further relief in light of the jury verdict and damage award. This court does note, however, that in view of the result reached on the jury instruction issue, the trial court may well have occasion on remand to consider again the propriety of equitable relief, specifically with respect to the breach of contract claim for OVCFM's failure to renew plaintiffs' subleases.
 
 
 85
 Defendants appeal the jury's finding that OVCFM breached a contractual obligation to expend one percent of gross sales (excluding tax) on advertising. This court finds no error. The jury was entitled to conclude that OVCFM's accounting practices evidenced an obligation to continue the expenditures despite omission of the express requirement in the new franchise agreements.
 
 
 86
 OVCFM further contends that testimony of plaintiffs' expert witness (Hanlon) as to OVCFM's accounting practices was inadmissible insofar as it constituted a matter of interpretation of the franchise agreement's provisions reserved by the contractual language to OVCFM as franchisor. OVCFM itself elicited the allegedly objectionable testimony from Hanlon on cross-examination and raised no objection to his responses. Hanlon claimed to have based his opinion on his review of OVCFM's own bookkeeping practices. The testimony of plaintiffs' expert witness on this issue was properly admissible. Moreover, even if the testimony in fact went to the interpretation of the contract and was not properly admissible, the admission into evidence of such was not inconsistent with substantial justice and fails to rise to the level of reversible error. See TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 550 (6th Cir. 1981). The district court's denial of defendant's motion for directed verdict and judgment n.o.v. on the advertising fund question is affirmed.
 
 
 87
 OVCFM also challenges on appeal the jury's calculation of damages on the advertising fund claim. The jury apportioned the difference between what OVCFM should have expended and what it actually did expend among plaintiffs on a pro rata basis predicated upon gross sales figures. OVCFM's failure to maintain a separate accounting as to each franchisee precluded a more precise determination. The jury nevertheless had a sound basis for a reasonable inference as to the degree of harm to each plaintiff. Defendant will not now be heard to complain that such damages lack precision or exactness where that result was attributable to defendant's own inadequate record keeping. See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 688 (1946) (FLSA case).
 
 
 88
 Plaintiffs assign as error the trial court's 'dismissal' of its original allegations of unlawful tying arrangements by defendants in violation of the Sherman and Clayton antitrust acts. 15 U.S.C. Secs. 1, 14. The trial judge on November 14, 1983 partially granted a motion by defendants which was construed as one for summary judgment. The trial court dismissed the Clayton Act tying claim as precluded because the tying item, the franchise agreement, was not within the definition of 'goods . . . or other commodities' as required by the statutory language and case law. After plaintiffs submitted a second amended complaint which apparently reiterated the dismissed Clayton Act tying count, the trial court on January 1, 1984 'DIRECTED [plaintiffs] to file an Amended Complaint . . . that properly delineates their claims, eliminating those which were dismissed in this Court's November 14, 1983 Order.' Plaintiffs' third amended complaint thereafter eliminated both the Clayton Act claims on which OVCFM had obtained summary judgment and those antitrust tying causes of action upon which the trial court had refused to grant summary judgment. Plaintiffs now charge that the January 11, 1984 district court order granted summary judgment to those claims as well and assign error with respect to that decision. Plaintiffs' argument is unavailing. The trial court's order was specific, clear, and limited to enforcement of its November 14 order. No judgment was entered on the antitrust tying claims that the trial court's November 14 order had declined to dismiss. Plaintiffs omitted from the third complaint a valid cause of action either voluntarily or mistakenly; in either instance no judgment was entered on the issue and no appeal lies.
 
 
 89
 OVCFM sought in the trial court recovery of attorney fees incurred in responding to several post-trial motions, which the trial court denied. Trial court decisions to award attorney fees as a punitive matter for the vexatious conduct of litigation are a matter of discretion. See, e.g., Morgan v. Union Metal Mfg., ---- F.2d ----, No. 83-3653 (6th Cir. Mar. 26, 1985). Since plaintiffs' post-trial motions included some of the matters involved in this appeal, it appears that the trial court did not abuse its discretion by denying the request for fees.
 
 
 90
 Plaintiffs also object on appeal to the district court's grant of intervention. On June 29, 1983, nine months after the commencement of this action, Lynch Enterprises, Inc., and others, all franchisees under agreements with OVCFM, requested intervention as party-defendants. The next day the trial judge granted the motion without issuing an opinion. Plaintiffs subsequently opposed the participation of the intervenors and have raised that opposition on appeal. Intervenors argue that their participation was proper under either Fed.R.Civ.P. 24(a)(2) (intervention of right) or 24(b)(2) (permissive intervention).[4]
 
 
 91
 Plaintiffs attack the intervention motion as untimely under Rule 24. A motion to intervene must be timely filed, United Airlines v. McDonald, 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977), or it must be denied, NAACP v. New York, 413 U.S. 345, 365, 93 S.Ct. 2591, 2602, 37 L.Ed.2d 648 (1973). Timeliness is a matter within the sound discretion of the district court. Stotts v. Memphis Fire Dept., 679 F.2d 579, 582 (6th Cir. 1982) (citing NAACP v. New York, 413 U.S. at 366, 93 S.Ct. at 2603; Michigan Ass'n for Retarded Citizens v.Smith, 657 F.2d 102, 105 (6th Cir. 1981)).
 
 
 92
 Within this circuit, timeliness involves consideration of five factors:
 
 
 93
 (1) the point to which the suit had progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his interest in the case; (4) the prejudice to the original parties due to the proposed intervenor's failure . . . to apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention.
 
 
 94
 Triax Co. v. TRW, Inc., 724 F.2d 1224, 1228 (6th Cir. 1984) (citing Michigan Ass'n for Retarded Citizens v. Smith, 657 F.2d 102, 105 (6th Cir. 1981)). In the case at bar, the record discloses that although substantial discovery had been completed before the intervenors sought to participate, substantial discovery and proceedings (including an aborted interlocutory appeal) were undertaken following the application for intervention. The district court did not abuse its discretion in finding the intervention motion to be timely.
 
 
 95
 The trial court's determination to allow intervention in the instant case, either of right or permissively, was proper and not an abuse of the trial court's discretion. Rule 24(a)(2) sets forth three elements that intervenors must satisfy to intervene as of right: (1) an interest in the property or transaction in the dispute; (2) absent intervention, a potential impairment of that interest as a result of the lawsuit; and (3) the original parties must be incapable of adequately representing that interest. Meyer Goldberg, Inc. of Lorain v. Goldberg, 717 F.2d 290, 292 (6th Cir. 1983) (quoting 7A Wright & Miller, Federal Practice and Procedure Sec. 1908 (1972)). The requisite interest must be direct and substantial. Id. Intervenors claim a significant and protectable interest because their franchise contracts are similar to those challenged by plaintiffs in most material respects. It was within the trial court's discretion to find this interest sufficiently direct and substantial and potentially subject to impairment by the instant litigation.
 
 
 96
 With respect to adequacy of representation of the original parties vis-a-vis the intervenors' interests, 'the applicant for intervention bears the burden of demonstrating inadequate representation.' Meyer Goldberg, Inc. of Lorain v. Goldberg, 717 F.2d at 293. This burden, however, is 'minimal.' Trbovich v. UMW, 404 U.S. 528, 538, n.10, 92 S.Ct. 630, 636 n.10 (1972). As such, it did not constitute an abuse of the trial court's discretion for the trial judge to determine that neither plaintiffs nor OVCFM would adequately forward intervenors' interests as successful franchisees.
 
 
 97
 Finally, permissive intervention was clearly proper as an alternative. Permissive intervention is within the discretion of the trial court. Arthur S. Langenderfer, Inc. v. S. E. Johnson, 729 F.2d 1050, 1060 (6th Cir. 1984). Rule 24(b) allows permissive intervention where the applicant's claim or defense and the main action have a question of law or fact in common and the intervention will not unduly delay or prejudice the adjudication of the rights of the original parties. Fed.R.Civ.P. 24(b). See supra note 4. The facts sub judice disclose no circumstances to support a contention of undue delay or prejudice to the original parties. Accordingly, permissive intervention was proper.
 
 
 98
 In view of the foregoing, the decision of district court is REVERSED and REMANDED for retrial on the breach of contract issue and further proceedings not inconsistent herewith.
 
 
 
 [1]
 The verdict form (IIIB) divided the breach of contract claim into only two elements, the lease renewal and the advertising expenditures:
 [FORM IIIB]
 We the jury unanimously find that defendant Ohio Valley breached its contracts with plaintiffs as follows:
 Lease Renewal
 YES NO
 Advertising Expenditure
 YES NO
 
 
 [2]
 OVCFM posits an alternate waiver theory with respect to the trial court's responses to the jury's questions. OVCFM cites a portion of the transcript not included in the joint appendix wherein plaintiffs apparently requested the court to simply 'tell( ) them to see the form.' In their reply, however, plaintiffs contend that the discussion reprinted in OVCFM's brief related to a different jury question concerning a different interrogatory. Reply Brief ofPlaintiffs-Appellants at 14. Because OVCFM did not include the full pertinent transcript in the joint appendix it is not possible to evaluate which party accurately characterized the context of the discussion. Resolution of this dispute does not affect resolution of the waiver claim, however, because the available record fails to reveal any significant objections to the trial court's announced intended responses
 
 
 [3]
 Rule 51 provides in relevant part:
 No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.
 Fed.R.Civ.P. 51.
 
 
 [4]
 Rule 24 provides in relevant part:
 (a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
 (b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: . . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.
 Fed.R.Civ.P. 24.